**Raymond K. PEIL, on behalf of himself and all others similarly situated, Appellant,**

v.

**Marvin M. SPEISER, Leon C. Baker, Marvin S. Calicor, Gerald Chice, Estate of Walter Kutler, Roy Marcus, Agis F. Kydonieus, Health-Chem Corporation, Drexel Burnham Lambert, Inc., Appellees.**

No. 85–1360.

United States Court of Appeals, Third Circuit.

Argued April 15, 1986.

Decided Nov. 28, 1986.

Rehearing and Rehearing In Banc Denied Dec. 30, 1986.

See also 97 F.R.D. 657.

Donald B. Lewis, Philadelphia, Pa., Richard D. Greenfield, C. Oliver Burt, III (argued), Greenfield & Chimicles, Haverford, Pa., for appellant.

Jerome J. Shestack (argued), Joseph C. Crawford, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees—Health-Chem Corp., et al.

Marc Durant (argued), Rita Durant, Marc Durant & Associates, Philadelphia, Pa., for appellee—Drexel Burnham Lambert, Inc.

Before SEITZ, HIGGINBOTHAM and BECKER, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.[1]

In this securities fraud case, purchasers of corporate stock, suing as a class, seek damages against the corporation and its officers, alleging that the officers' misrepresentations about the corporations's business prospects artificially inflated the price of its stock and induced the purchasers to make a losing investment. The plaintiffs alleged violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); section 11 of the Securities Act of 1933, 15 U.S.C. § 77k; and the common law. With respect to their rule 10b–5 claim plaintiffs alleged violations of clauses (a), (b) and (c) of 17 C.F.R. § 240.10b–5 (1986). Following a five-week jury trial the district court directed a verdict in favor of the defendants on the Rule 10b–5(b) claim and submitted the remaining claims to the jury which found for all defendants, including the corporations' underwriters on a bond issue, on all claims. In part I, we unanimously affirm the judgment entered on the verdicts returned by the jury.

Because the class representative did not prove direct reliance upon the defendants' representations, we are called upon to consider the soundness of the "fraud on the market" theory of causation. Under this widely accepted theory, *see infra* part II, the purchasers can establish causation by showing that, in making their purchase, they relied on the price of the stock, which in turn had been skewed by the fraudulent actions. In part II, we unanimously approve of this theory and establish it as the law of this circuit. However, we must also address the question of the applicability of the fraud on the market theory to claims of individual misstatements or omissions under rule 10b–5(b). The defendants urge us to limit the use of the fraud on the market theory to claims of a scheme to defraud under rules 10b–5(a) and (c), 17 C.F.R. § 240.10b–5(a) and (c). Because the market is distorted by a 10b–5(b) violation as well as by a 10b–5(a) or (c) violation, we decline to recognize such a distinction, and therefore hold, in Part III, that the district court should have submitted the rule 10b–5(b) claim to the jury on a fraud on the market theory, rather than directing a verdict for defendants on that issue.[2] However, we also find that, in view of the manner in which the rule 10b–5(a) and (c) claims were submitted to the jury, the verdict on the rule 10b–5(a) and (c) claims serves as a bar to a new trial on the rule 10b–5(b) claim.[3] The judgment of the district court will therefore be affirmed in all respects.

## I. *Facts and Procedural History*

Defendant Health-Chem Corporation is a company involved in various lines of business, most relevantly the development of technology that permits the regulated release of chemicals through plastic membranes. The individual defendants are officers of Health-Chem: Marvin Speiser, Chairman of the Board and President; Roy Marcus, Senior Vice President; Leon C. Baker, a member of Health-Chem's Executive Committee; and Agis Kydonieus, Executive Vice-President of Health-Chem's

---

1. Although Judge Becker has authored the majority opinion, he disagrees with the views set out in part IV, regarding the preclusive effect of the jury verdict. Judge Becker's views on this issue are set out in the separate dissenting statement on the preclusive effect of the jury verdict, which follows this opinion.

2. Judge Seitz does not join in part III of this opinion. He assumes that the fraud on the market theory applies to 10b–5(b) claims but declines to reach the question, believing it unnecessary in view of the holding in part IV.

3. *See* n. 1 *supra.*

Hercon Division. Drexel Burnham Lambert, an investment banking firm that underwrote an April 15, 1981 offering of Health-Chem convertible debentures, is a defendant with respect to the claim brought by plaintiffs under § 11 of the Securities Act of 1933, 15 U.S.C. § 77K. The plaintiff class consists of individuals who purchased Health Chem's stock from April 15, 1980 through November 2, 1981 and sold at a loss.

During the late 1970's, Health-Chem developed technology designed to combat gypsy moths with the aid of an aphrodisiac called "pheromone." [4] During 1980 and 1981, when gypsy moth defoliation was a matter of great concern, Health-Chem's work attracted the attention of security analysts, newspapers, scientific journals, and gardening journals. Although the price of Health-Chem's stock rose substantially during the latter half of 1980 and early 1981, it subsequently declined. Named plaintiff Raymond K. Peil purchased 500 shares of Health Chem's stock on December 5, 1980, in the midst of the stock's surge. After the decline of the stock's price, he sold his shares for a loss in excess of $6,000. The other members of the plaintiff class made similarly unprofitable investments in Health-Chem's stock during this period.

Peil brought this action in the United States District Court for the Eastern District of Pennsylvania, on behalf of himself and all others similarly situated, alleging that Health-Chem Corporation and its officers and directors had violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, and had committed various common law offenses. With respect to their rule 10b–5 claim, plaintiffs alleged that Health-Chem and its directors and officers had violated clauses (a), (b) and (c) of 17 C.F.R. § 240.10b–5 (1986). Peil also claimed that Drexel Burnham Lambert, Inc., had violated Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k.

The gravamen of plaintiffs' case was that the price of Health-Chem's stock had been artificially inflated by the defendants' false and misleading statements about Health-Chem's business prospects, and that the price of the shares induced plaintiffs to purchase Health-Chem's stock. Plaintiffs alleged that they had suffered financial losses when the falsity of defendants' representations became apparent and the stock fell to its true value.

Following certification of a class pursuant to Fed.R.Civ.P. 23(b)(3), the case proceeded to a five-week jury trial during which plaintiffs presented 29 witnesses and 200 exhibits. Plaintiffs sought to establish that defendants [5] knew that the pheromone was not likely to be effective, and that they intentionally disseminated false and misleading information in order to increase the value of Health-Chem's stock.[6] Plaintiffs

---

**4.** Defendants explain the technology as follows: Pheromones are chemicals which female insects release during mating season. Males are irresistibly drawn by the scent and will attempt to locate the source of the pheromone. Pheromones are used to disrupt mating in two ways. They can be sprayed from airplanes over large areas so that males will become confused and will be unable to locate females in the pheromone cloud which blankets an entire area. Pheromones can also be used to bait traps for the males. Males are lured to the traps expecting to find females. Instead, they find a speedy end. Either way, the result is that females lay unfertilized eggs. By interfering with mating of insects, pheromones can reduce and control insect populations.... Health-Chem developed its pheromone technology for agricultural use as a

substitute for toxic insecticides. Health Chem also developed a gypsy moth trap for individual home owners to be used in combatting gypsy moth infestation of trees.... The trap was a cardboard box, much in the shape of a large milk container.... The gypsy moth trap released pheromones which attracted male gypsy moths to the trap where they died. Health-Chem's brief at 4–5, 8.

**5.** Here and hereinafter, "defendants" refers to Health-Chem and its officers, but not to Drexel Burnham Lambert.

**6.** Plaintiffs' evidentiary presentation sought to establish, *inter alia,* the following:
1. The Company's third quarter report for 1979 grossly exaggerated the state of the pheromone technology and the profits that would likely result from the product.

also sought to establish: 1) that as a result of the misrepresentations and material omissions, Health-Chem's stock was very heavily traded and was a leading percentage gainer on the American Stock Exchange in 1980; 2) that the pheromone never lived up to its billing and was eventually abandoned by Health-Chem; and 3) that plaintiffs suffered losses as a result of their purchase of Health-Chem's stock.

The most significant testimony was Peil's own. Peil testified that he had purchased the stock on the recommendation of his broker, who advised him of an article in *Financial World* magazine that predicted an enormous increase in Health-Chem's stock. The article included allegedly false representations by individual defendants about Health-Chem's outstanding prospects. Peil conceded that he had never read the *Financial World* article and that, apart from that article, he had neither read nor heard of defendants' alleged misrepresentations.

After plaintiffs presented their evidence, defendants moved for a directed verdict on the rule 10b–5 and common law claims on the ground that Peil had failed to produce evidence from which a jury could conclude that he had relied on defendants' alleged misrepresentations and omissions. The dis-

2. On January 11, 1980, a stock brokerage firm issued a research report, based on interviews with defendants, stating that in 1980 Health-Chem would realize enormous profits from commercial sales of pheromones within two years. The report, circulated with defendants' approval, was false.

3. On April 14, 1980, Speiser announced at a meeting of the Boston Amex Club that in 1980 Health-Chem would sell a pheromone insect trap that would be very valuable in fighting gypsy moths. He was quoted in the *Boston Globe* newspaper as boasting, that as a result of Health-Chem's product, the gypsy moth would soon "become a memory."

4. Health-Chem's 1979 Annual Report, released around June 1980 and featuring the gypsy moth on its cover, included false boasts by Speiser. He wrote that Health-Chem's pheromone product would penetrate the market held by insecticides, which he grossly exaggerated to be a $3.5 billion market. The 1979 Annual Report omitted key facts, *e.g.*, Health-Chem could not penetrate the market without a "big brother," *i.e.*, a large corporate affiliate.

5. In its first quarter report, disseminated around June 1980, Health-Chem strongly implied that it would enter the insecticide market in a joint venture with a major chemical company. The report was apparently contemplating a venture with Union Carbide, but neglected to mention that Union Carbide had disavowed interest in such a venture.

6. On June 16, 1980, a brokerage firm issued a research report on Health-Chem. The report, based on interviews and information provided by Health-Chem, greatly exaggerated earning estimates for Health-Chem in 1981 and falsely stated that it would be a "pivotal" year for the company.

7. In July 1980 Speiser and Kydonieus told the Houston Amex Club that a "floodtide" of profits was imminent. This was reported in the Houston Business Journal.

8. On September 2, 1980, after an interview with Speiser, the Wall Street Journal quoted Speiser as predicting that Health-Chem would do $5 to $10 million dollars in sales in 1981, largely as a result of their pheromone products.

9. At the behest of Health-Chem, the articles described in items 7 and 8 above were reprinted and widely disseminated to the investing public.

10. In October 1980, *Financial World* magazine, having interviewed Speiser and checked relevant facts with Speiser and Marcus, printed a feature story containing numerous inaccuracies and predicting enormous profits for Health-Chem in the near future.

11. On February 12, 1981, the New York Times quoted Speiser as projecting $5 to $10 million in sales of new products including the moth traps.

12. In February 1981 a Massachusetts investor publication, *Mass Med News*, quoted Speiser as saying that Health-Chem was "all alone in a $25 billion market."

It was defendants' position at trial that their statements and financial figures were accurate and their predictions were reasonable. They contended that the analyses by security analysts and financial columnists reflected the independent judgment of those writers, and, in any event, were more balanced and less optimistic than plaintiffs suggested. They noted, for example, that the *Financial World* article declared that it was a "crapshoot" as to whether the pheromone technology would prove fruitful to farmers. Defendants also claimed that their market predictions were not far from the mark. For example, the company projected that it would sell 1,000,000 traps in 1981 and did succeed in selling 915,000. Additionally, it was defendants' position that plaintiff Peil had not relied on the alleged misrepresentations in any event.

trict court granted a directed verdict for defendants on the common law claims and the rule 10b–5(b) claim. The court stated that Peil's own testimony that he was unaware of defendants' representations conclusively rebutted that presumption: "[n]o reasonable person could conclude that the named plaintiff relied in any way on any recommendation or misrepresentation by defendants. . . . The named class representative's own testimony rebuts the presumption of reliance." App. at 1867–68. The district court then decertified the class with respect to the rule 10b–5(b) and common law claims. The court, however, denied defendants' motion for a directed verdict with respect to the rule 10b–5(a) and (c) claims. It stated that "direct" reliance by plaintiffs on defendants' misrepresentations is not an essential element of those claims. Rather, it stated, defendants could be found liable if they committed a fraud on the market, *i.e.*, if they were involved in a scheme that affected the market price of the stock which, in turn, induced appellants to purchase the stock, *see infra* pp. 1160–1163.

The court then submitted plaintiffs' rule 10b–5(a) and (c) and § 11 claims to the jury by special interrogatories, Fed.R.Civ.P. 49(a). On the basis of the jury's responses to the interrogatories, and the district court's previous rulings on defendants' motions for directed verdicts, the court entered judgment for the defendants on all claims.

Plaintiffs moved for judgment n.o.v. on the § 11 claim, but the court denied the motion. Judgment was entered on the verdicts and plaintiffs appealed, seeking 1) vacatur of the verdicts and the final judgment; 2) reversal of the judgment on the § 11 claims; 3) a new trial on plaintiffs' § 10 and pendent common law claims; and 4) a trial on a civil RICO claim that the district court refused to allow plaintiffs to amend their complaint to interpose. Our jurisdiction is pursuant to 28 U.S.C. § 1291.

Although plaintiffs allege a number of trial errors, with the exception of the point discussed in part III *infra*, the allegations are without merit.[7] Because the challenge to the rule 10b–5(a) and (c) judgments is based solely on such allegations, we will affirm the judgment of the district court insofar as it is based on those claims. We also find that plaintiffs' challenges to the § 11 verdict and the directed verdict on the common law claims are meritless.[8]

The district court's directed verdict on the rule 10b–5(b) claim is troublesome,

---

**7.** These allegations of error are challenges to discretionary evidentiary rulings, denial of a motion for mistrial, denial of a motion for leave to amend the complaint to include the RICO claim, and the contents of the court's jury charge.

**8.** The § 11 claim concerned alleged inaccuracies in the registration statement or the prospectus for an April 15, 1981 issuance by Health-Chem of convertible debentures. The verdict for defendants resulted from the jury's answer to a special interrogatory finding that the registration statement and prospectus contained no untrue statements of material fact and made no material omissions. The scope of review of the jury's finding is, of course, exceedingly narrow, *Eisenberg v. Gagnon,* 766 F.2d 770, 779 (3d Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985), and we are satisfied that the jury's finding was supported. We explain *infra* n. 13 why the directed verdict on the common law claims was proper.

We are less certain that the court was correct in decertifying the class with respect to the common law claims. In decertifying the class with respect to those claims, the court stated that "individual issues of reliance predominate." App. at 1868. There is no consensus among the federal courts as to the propriety of certifying Fed.R.Civ.P. 23(b)(3) classes in common law securities fraud cases, even when such claims are pendent to 10b–5 claims. *Compare Seiden v. Nicholson,* 69 F.R.D. 681, 686 (N.D.Ill.1976) (denying certification) *with Dekro v. Stern Brothers & Co.,* 540 F.Supp. 406, 418 (W.D.Mo. 1982) (upholding certification). However, the district court's determination that individual issues of reliance predominated is reviewed on an abuse of discretion standard. *Geraghty v. United States Parole Commission,* 719 F.2d 1199, 1204 (3d Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 133 (1984). We find no abuse of discretion here.

Finally, plaintiffs contend that even if the court were correct in directing a verdict for defendants with respect to Peil's rule 10b–5(b) claims, it erred in subsequently decertifying the class. In light of our disposition of the case, we need not reach that issue.

however, and our evaluation of it requires resolution of a legal question heretofore unaddressed by this court—the applicability of the "fraud on the market" theory to rule 10b–5 claims in general and rule 10b–5(b) claims in particular.

## II. *Legal Background on Rule 10b–5; The Fraud on the Market Theory*

Section 10 of the 1934 Securities Act provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Subsequent to passage of the 1934 Act, the Securities and Exchange Commission promulgated Regulation 10b–5, providing that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) to employ any device, scheme, or artifice to defraud,
>
> (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading, or
>
> (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit

upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b–5.

Section 10 was built on, and retained, many of the characteristics of the common law tort action of deceit. *See* 3 Loss, *Securities Regulation* 1430 (1961). To prevail in such an action, a plaintiff had to establish six elements: 1) a false representation of 2) a material 3) fact; 4) defendant's knowledge of its falsity and his intention that plaintiff rely on it; 5) the plaintiff's reasonable reliance thereon; and 6) his resultant loss. *Id.* at 1431. There is little dispute that plaintiffs in § 10(b) claims must generally satisfy all of these requirements as well,[9] but only the reliance requirement concerns us here.

Traditionally, plaintiffs in a rule 10b–5 suit had the burden of establishing that they relied on the fraudulent actions of the defendant. *List v. Fashion Park, Inc.*, 340 F.2d 457, 463 (2d Cir.), *cert. denied*, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Thus, plaintiffs were required, as a threshold matter, to establish that they were aware of and directly misled by defendant's actions. However, many courts have come to realize that, in certain situations, the requirement of showing direct reliance "imposes an unreasonable and irrelevant evidentiary burden." *Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir.1975).

The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. *See* Note, *The Fraud-on-the-Market-Theory*, 95 Harv.L. Rev. 1143, 1154–56 (1982). Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. The misstatements may affect the price of the stock, and thus defraud purchasers who rely on the price as an indication of the stock's value. By artificially inflating the price of the stock, the misrepresentations

---

**9.** One exception is that a showing of recklessness, as opposed to actual intent, suffices for a violation of § 10(b). *Eisenberg v. Gagnon*, 766 F.2d 770, 778 (3d Cir.1985).

defraud purchasers who rely on the price as an indication of the stock's value. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations. In both cases, defendants' fraudulent statements or omissions cause plaintiffs to purchase stock they would not have purchased absent defendants' misstatements and/or omissions.

■ Accordingly, we hold that plaintiffs who purchase in an open and developed market [10] need not prove direct reliance on defendants' misrepresentations, but can satisfy their burden of proof on the element of causation by showing that the defendants made material misrepresentations. If plaintiffs make such a showing, the court will presume that the misrepre-

sentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock. The defendants are, of course, free to assert appropriate defenses, including the defenses that the market did not respond to the alleged misrepresentations, and that plaintiffs knew of the falsity of defendants' representations or would have purchased the stock even if they had known of them. In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchasers generally rely on the price of the stock as a reflection of its value. *See In Re LTV Securities Litigation*, 88 F.R.D. 134, 145 (N.D.Tex.1980) (Higginbotham, J.).[11]

10. The "fraud on the market" theory rests on the assumption that there is a nearly perfect market in information, and that the market price of stock reacts to and reflects the available informatation. While this presumption is plausible in developed markets, it may not be in the case of newly issued stock. As the case at bar involves a widely traded and established stock, we need not consider whether we would apply the "fraud on the market" theory in other instances.

11. This court foreshadowed adoption of the theory in *Sharp v. Coopers and Lybrand*, 649 F.2d 175 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). *Sharp* involved a question left open by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), in which the Court held that, where the alleged fraud consisted of material omissions rather than affirmative misrepresentations, reliance is to be presumed and the burden shifts to defendants to rebut it. *Sharp* concerned whether the burden with respect to reliance should similarly be shifted in a case where plaintiffs alleged both misrepresentations and omissions. We held that, on the facts of that case, it was appropriate for the district court to presume reliance and to shift the burden to defendants to rebut that presumption. Although we did not consider whether to adopt the "fraud on the market" theory, we observed that reliance was simply "one aspect of the ubiquitous requirement that losses be causally related to the defendants wrongful acts," 649 F.2d at 186, and that "where it was logical to do so," the burden should be shifted to defendants to disprove reliance, *id.* at 188.

Thus, in *Sharp*, we recognized two important facts: 1) that the linchpin of the reliance re-

quirement is a causal connection between defendants' actions and plaintiff's purchase of stock; and 2) that in certain cases, it is sensible to shift the burden of disproving reliance to the defendants. In a sense, the "fraud on the market" theory stems from a combination of these observations. In the case of a developed market, plaintiffs' purchase of stock can be causally related to defendants' misrepresentations even if plaintiffs did not directly rely on the misrepresentations. Moreover, the likelihood of this causal connection is so strong that it is logical to presume reliance and to shift the burden of rebutting that presumption to defendants. Therefore, *Sharp* supports our adoption of the "fraud on the market" theory. *See In Re LTV Securities Litigation*, 88 F.R.D. 134 at 142. ("Market reliance theory can also be viewed as an extension of the presumption of reliance in omission cases to misrepresentation cases involving market transactions.").

In addition, we note that some version of the fraud on the market theory has been adopted by every court to consider the question, *see, e.g., Lipton v. Documation, Inc.*, 734 F.2d 740 (11th Cir.1984), *cert. denied*, 469 U.S. 1132, 105 S.Ct. 814, 83 L.Ed.2d 807 (1985); *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority*, 717 F.2d 1330 (10th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Panzirer v. Wolf*, 663 F.2d 365 (2d Cir.1981), *cert. denied*, 458 U.S. 1107, 102 S.Ct. 3486, 73 L.Ed.2d 1368 (1982), *vacated as moot sub nom. Price Waterhouse v. Panzirer*, 459 U.S. 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982); *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981) (in banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983) (applying theory to purchase of newly-issued stock); *Blackie v. Barrack*, 524 F.2d 891 (9th Cir.1975); *Rosenberg*

### III. Does the "Fraud on the Market" Theory Apply to Rule 10b–5(b) claims? [12]

Defendants do not contest the validity of the fraud on the market theory generally,[13] but contend that it ought to be limited to rule 10b–5(a) and (c) claims, and that plaintiffs should retain the burden of establishing direct reliance in rule 10b–5(b) claims. This was the position of the district court. Plaintiffs assert that there is no justification for limiting the theory in this way and that it ought be applied to rule 10b–5 claims whether cognized under clause (a), (b) or (c).

This question is complicated by the uncertainty surrounding the differences and overlap among the three clauses of rule 10b–5.[14] For present purposes, the salient distinction between clause (b) on the one hand, and clauses (a) and (c) on the other, is that the latter arguably require proof of a *scheme* to defraud, whereas clause (b) is indisputably satisfied by a single fraudulent action.

■ We need not decide whether this alleged distinction is accurate, *i.e.*, whether clauses (a) and (c) do require a scheme, because even assuming the distinction, we believe that the existence of a scheme to defraud is irrelevant to the applicability of the fraud on the market theory. Even under the theory, plaintiffs must show that defendant's misrepresentations were "material." Material misrepresentations or omissions, by definition, are likely to influence the behavior of buyers and sellers and thus to affect the market. A single misrepresentation or omission, like a more widespread scheme, may artificially inflate the price of stock and thus defraud plaintiffs who rely on the price of the stock in deciding to purchase shares. *See Digilog*, 648 F.Supp. at 42, Fed.Sec.L.Rep. (CCH) ¶ 92,274 at 91,895 (applying fraud on the market to 10b–5(b) action) ("Imposing such a requirement [of a scheme] creates another burden which could effectively preclude the maintenance of otherwise legitimate suits under the Security laws. Securities legislation, enacted for the purpose of avoiding fraud, is intended by Congress to be construed ... flexibly to effectuate its remedial purposes.").

Neither the district court nor defendants have explained why rule 10b–5(b) claims should be exempt from the "fraud on the market" theory. Appellees rely on the authority of *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1982), which held that the theory was applicable to clause (a) and (c) allegations of a pervasive scheme, but inapplicable to clause (b) claims of particular misrepresentations or omissions. *But see Lipton v. Documation, Inc.* 734 F.2d 740, 747 n. 11 (11th Cir.1984) (expressing discomfort with *Sklar's* limitation of the "fraud on the market" theory to cases involving a scheme). *Sklar*, however, involved a newly issued security rather than a security already being traded in a well-developed market. As we read *Sklar*, the court believed it unlikely that a single misrepresentation or omission would result in the sale of a new

*v. Digilog*, 648 F.Supp. 40, Fed.Sec.L.Rep. (CCH) ¶ 92,274 at 91,895 (E.D.Pa.1985); *In Re Ramada Inns Securities Litigation*, 550 F.Supp. 1127, 1131 (D.Del.1982); *In Re LTV Securities Litigation*, 88 F.R.D. 134 (N.D.Tex.1980), and has been well-received by commentators, *see, e.g.*, Rapp, *Rule 10b–5 And "Fraud on the Market"—Heavy Seas Meet Tranquil Shores*, 39 Wash. & Lee. L.Rev. 861 (1982); Note, *Fraud on the Market: An Emerging Theory of Recovery Under SEC Rule 10b5*, 50 Geo.W.L.Rev. 627 (1982); Note, *The Fraud-on-the-Market-Theory*, 95 Harv.L.Rev. 1143 (1982).

**12.** Judge Seitz does not join in this part of the opinion. *See supra* n. 2.

**13.** Defendants do suggest at one point that the theory is useful only for the purposes of class certification but not for use at trial. Appellee's brief at 27 n. 4. We find this contention meritless.

**14.** One commentator recently described the confusion as follows:

10b–5 seems to have another mysterious capacity, perhaps shared by the human brain: one part can take over the function of the other.

A. Bromberg & L. Lowenfels, *Securities Fraud and Commodities Fraud* 49 (1983).

security; only a widespread scheme could have that effect. Regardless of whether the *Sklar* court was correct in requiring direct reliance on the misrepresentations in such a case, its rationale does not apply here, because a well-developed market can reasonably be presumed to respond to even a single material misrepresentation or omission concerning a stock already being traded in that market.[15] We therefore conclude that the fraud on the market theory pertains to rule 10b–5(b) claims as well as claims brought under clauses (a) and (c).[16]

Defendants urge that even if we apply the fraud on the market theory to plaintiffs' rule 10b–5(b) claim, Peil's testimony that he had not directly relied on the alleged misrepresentations conclusively rebutted the presumption of reliance. This argument, however, misses the point of the fraud on the market theory, under which a plaintiff may prevail even if he was entirely unaware of the alleged misrepresenta-

tions. Under the fraud on the market theory, plaintiffs' reliance is not on defendants' fraudulent actions directly, but on the marketplace's reflection of the value of the stock. Thus, this reliance can be rebutted by showing that either: 1) the misrepresentations did not affect the market price of the stock; or 2) plaintiff would have purchased the stock even at the price it would have been at but for the misrepresentations. In this case, defendants did not attempt to establish either of these points. Peil's testimony established only that he did not rely *directly* on defendants' misrepresentations, a fact that is not relevant under the fraud on the market approach.[17]

## IV. The Preclusive Effect of the Jury Verdict

As noted above, the district court permitted plaintiffs to proceed on a fraud on the market theory with respect to their rule 10b–5(a) and (c) claims. The court charged

**15.** Interestingly, there is a suggestion in *Sklar* that the court believed the "fraud on the market" theory to be applicable *only* in the case of newly-issued stocks that would not have been sold at all—and hence would not have been issued—without the issuer's fraudulent conduct. 647 F.2d at 471. However, the Eleventh Circuit, precedentially bound by *Sklar,* has rejected such a reading as untenable:

> [*Sklar*] dictates that this circuit recognize the fraud on the market theory as a basis for recovery where the defendant's deception inflates open market stock prices. To hold otherwise would result in this circuit adopting the theory in a setting where its applicability has been questioned, and rejecting its use where it best advances the goals of the federal securities laws.

*Lipton,* 734 F.2d at 745. Regardless of what *Sklar* did in fact hold, we agree with the *Lipton* court that there is no rationale for limiting the "fraud on the market" theory to the issuance of new securities. With the possible exception of the *Sklar* court, no court has done so.

**16.** In addition to the Fifth Circuit in *Sklar,* one other circuit court and one district court have applied the fraud on the market theory to 10b–5(a) and (c) allegations of a widespread scheme, while refusing to apply it where only misrepresentations or omissions under 10b–5(b) were alleged. *Sklar, supra; Huddleston v. Herman & MacLean,* 640 F.2d 534, 548 (5th Cir.1981); *Mottoros v. Abrams,* 524 F.Supp. 254 (N.D.Ill.1981). *See also* 4 *Newberg on Class Actions* 23 (2nd ed. 1985) (assuming fraud on the market theory to

be applicable only to rule 10b–5(a) and (c) claims involving schemes). These courts, however, have given no reason for this distinction. Moreover, *Blackie,* the seminal fraud on the market case, appears to have involved a rule 10b–5(b) claim. Although the *Blackie* court never stated under which subsection of rule 10b–5 plaintiff's claim fell, the case involved only a few misrepresentations in a company's annual report and the court quite clearly did not require a scheme in order to invoke the fraud on the market theory. *See Digilog,* 648 F.Supp. at 40, Fed.Sec.L.Rep. (CCH) ¶ 92,274 at 91,895 (McGlynn, J.) ("*Blackie* did not require proof of a common scheme."); Note, *The Fraud on the Market Theory,* 95 Harv.L.Rev. 1143, 1147 n. 25 (1982) ("The *Blackie* reasoning makes a fraud-on-the-market theory available in a rule 10b–5(b) claim as well as in claims based on 10b–5(a) and 10b–5(c).").

**17.** While the fraud on the market theory is good law with respect to the Securities Acts, no state courts have adopted the theory, and thus direct reliance remains a requirement of a common law securities fraud claim. *See Rosenberg v. Digilog,* 648 F.Supp. 40, Fed.Sec.L.Rep. (CCH) ¶ 92,274 at 91,895 (E.D.Pa.1985). The district court was therefore correct to direct a verdict against Peil on the common law claims. Peil was unaware of all but one of defendants' alleged misrepresentations. While his broker informed him of the *Financial World* article, Peil did not claim that he would not have purchased Health-Chem's stock but for the article.

the jury accordingly, and submitted to the jury the following special interrogatory:

Did any of the following defendants knowingly or recklessly employ any device, scheme or artifice which defrauded plaintiffs in connection with their purchase or sale of Health-Chem stock, or knowingly or recklessly engage in any act, practice or course of business which operated as a fraud or deceit upon plaintiffs in connection with their purchase or sale of Health-Chem stock?

The jury marked a space designating "No" with respect to each individual defendant, and the court therefore entered a verdict for defendants on the rule 10b–5(a) and (c) claims.

Defendants contend that the jury's answer to this interrogatory precludes plaintiffs from attacking the propriety of the directed verdict on rule 10b–5(b). They point out that the interrogatory asked if defendants had employed *any* fraudulent device or had engaged in *any* fraudulent act. Defendants argue, therefore, that the jury's response in the negative amounts to a finding that appellees committed no improper act, including any misrepresentations or omissions in violation of rule 10b–5(b). The jury's factual finding, they contend, necessarily defeats any claim under 10b–5(b), as well as under clauses (a) and (c).

Plaintiffs' respond that defendants' argument makes sense only if the interrogatory is read in a vacuum. In their submission, when one reads the court's charge to the jury, which is quoted in the margin,[18] the

---

18. The district court charged the jury as follows:

Now, rule 10b–5 provides, so far as it is pertinent to this case, that it shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce or of the mails: (a) to employ a device, scheme or artifice to defraud;

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Now, it should be quite clear to you, from the summations of both Mr. Lewis, and Mr. Shestack, that what the 10b–5 claim is about is fraud. Plaintiffs contend that Health-Chem, these defendants, Health-Chem, Speiser, Baker, Kydonieus, and Marcus, committed a fraud on the market. That they violated the rule that I have just read to you, by artificially driving up the price, the market price of the Health-Chem stock.

Now, in order to prevail on this claim, plaintiffs must prove by a preponderance of the evidence and I have defined that term to you, it goes without saying, that whenever I say, any party must prove something, in my instructions to you, it means that they must prove it, by a preponderance of the evidence.

So, plaintiffs must prove, that any one or more than one, or all of the defendants, on this claim, engaged in some act, practice, or course of business, which operated as a fraud or a deceit upon plaintiffs, in connection with the purchase or sale of Health-Chem stock, or that only any one or all of the defendants, more than one, or all, employed a device, scheme or artifice to defraud the plaintiffs by artificially inflating the market price for Health-Chem stock, again in connection with plaintiff's purchase or sale of Health-Chem stock.

Now, in deciding whether any one or more, or all of the defendants engaged in any such activity, you may consider whether the defendants made any untrue statement or statements of material fact or omitted to state any material fact or facts. As plaintiffs contend, that part of the fraud, was the making of such statements.

In response to this claim, the defendants deny that they made any misrepresentation, that they omitted to state any material facts, they deny that they committed any fraud whatsoever, they say that they did not violate the rules, they say that the market for the Health-Chem stock moved according to normal market forces.

Now, what is material. A fact is material, if there is a substantial likelihood that under all the circumstances, the statements would have assumed actual significance to a reasonable person, considering the purchase or the sale of Health-Chem stock.

An omitted fact is material if a reasonable person would have considered knowledge of that fact important in determining whether to buy or sell the stock.

In determining whether information is material, you may consider the extent to which the information had already been disclosed to the public.

The security laws applicable to this case, focus on disclosure to the investing public. Disclosure to the investing public, not disclosure to consumers.

A consumer is a member of the public—I'm sure I'm stating the obvious, who purchases goods for sale that have been sold to him. An

case takes on a different complexion. Plaintiffs assert that an examination of the charge demonstrates that the jury was instructed that only a "scheme" to defraud warranted a finding of liability. The court explained, they point out, that "[t]he question is whether defendants made any material misrepresentations or ommissions [*sic*] to consumers *as part of a scheme* in order to artificially increase the price at which Health-Chem stock was selling." App. at 1950. The court, plaintiffs note, went on to say, "you must also find that the information directed to consumers *was part of a course of business or scheme* in violation of the rule [10b–5]." *Id.*[19]

■ The majority has carefully considered the plaintiffs' arguments. It believes, however, that the jury necessarily passed on the rule 10b–5(b) claim based on misstatements in finding defendants not liable under rule 10b–5(a) and (c). The majority concludes that the jury's finding is preclusive and the panel will therefore not grant a new trial on the 10b–5(b) claim.

The entire case of the plaintiffs involved a number of alleged misstatements attributed to defendants. None of plaintiffs' evidence was withheld from the jury as a result of the district court's directed verdict on the rule 10b–5(b) claim. In addition, in charging the jury on the 10b–5(a) and (c) claims, the court in fact defined each element required to prove a 10b–5(b) claim. Finally, although we have made the point above, we repeat here in view of its importance the fact that the district court submitted the following special interrogatory to the jury:

> Did any of the following defendants knowingly or recklessly employ any device, scheme or artifice which defrauded plaintiffs in connection with their purchase or sale of Health-Chem stock, or knowingly or recklessly engaged in *any act,* practice or course of business *which operated as a fraud or deceit upon plaintiffs in connection with their purchase or sale of Health-Chem stock?*

(emphasis supplied). Under this interrogatory, even a single fraudulent act, includ-

---

investor is an individual who buys securities such as stocks.

As you are probably aware, companies frequently use advertising to inform customers about their products. The securities laws are not consumer protection provisions, rather they act to protect investors. It will be for you, the jury, to decide whether any material statement made or omitted by the defendants, if you should find that a material misstatement was made, or that a material statement was omitted by the defendants, was directed to consumers or to investors.

If you find that such statements or ommissions [*sic*] were directed to consumers, then, in order for these statements to have been made in connection with the purchase or the sale of the Health-Chem stock, which is an essential element of a 10b–5 claim, that anything wrongful done, must have been done in connection with the purchase or the sale of Health-Chem stock, you must also find that the information directed to consumers, was part of a course of business or scheme, in violation of the rule. If it was not, you may not consider those alleged misstatements or ommissions [*sic*] in deciding whether defendants engaged in any act, practice, course of business, device, scheme, or artifice to defraud plaintiffs.

In other words, even if you should determine I'm not suggesting you should or should

not so determine but even if you should determine that defendants promoted and sold a product, and that product was a bad product and they knew it was a bad product, and nonetheless they went ahead in such a way to intentionally defraud consumers, if you should find that, that fact standing by itself cannot be a basis for holding defendants liable in this case.

The question is whether defendants made any material misrepresentations or ommissions [*sic*] to consumers, as part of a scheme in order to artificially increase the price at which Health-Chem stock was selling on the American Stock Exchange.

If defendants' conduct with respect to consumers was solely to induce them to buy the company's product and was not part of any such device or scheme or practice as I have defined it, that conduct would not be in connection with plaintiffs' purchase or sale of Health-Chem stock.

**19.** As has been stated above, *see supra,* typescript at 1156, n. 1, Judge Becker, the opinion writer, believes that the jury verdict is not preclusive. He would therefore reverse and remand for a new trial on the 10b–5(b) claim. His dissenting view on this point is set forth in a separate dissenting statement. The immediately following text reflects the views of Judges Seitz and Higginbotham, constituting the majority on the preclusion point.

ing a single misstatement, would warrant an affirmative answer to the interrogatory. The jury thus necessarily rejected 10b–5(b) liability in returning a negative answer to the interrogatory.

The dissent says, in effect, that this understanding of the case makes sense only if the interrogatory is read without regard to the language of the jury charge as a whole. On the contrary, while the charge dealt only with the (a) and (c) claims as such, it effectively defined the requisites for liability under (b). Thus, after stating the terms of rule 10b–5(a) and (c), the district court instructed the jury "in deciding whether any one or more, or all of defendants engaged in any such activity, you may consider whether the defendants made any untrue statement or statements of material fact or omitted to state any material fact or facts."

It is true that the same paragraph of the charge concludes: "plaintiffs contend that part of the fraud was the making of such statements." The dissent suggests that this language barred a finding of liability predicated exclusively on a single misstatement. The district court certainly makes repeated references in its instructions to the requirement of a "scheme" or "course of business." It does so, however, in the context of explaining that the fraud must be in connection with the sale or purchase of securities, and that fraud on the market liability is based on an effort to inflate the stock price artificially. In its setting, then, the instruction does not exclude the finding of liability based on a single misstatement.

The charge included a long discussion distinguishing securities fraud from efforts to defraud consumers about the nature of defendants' product. The district court told the jury that if they found only misstatements made to consumers, and none directly to investors, the jury must find an additional tie to investors for liability to attach:

If you find that such statements or ommissions [sic] were directed to consumers, then, in order for these statements to have been made in connection with the purchase or the sale of the Health-Chem stock, which is an essential element of a 10b–5 claim, that anything wrongful done, [sic] must have been done in connection with the purchase or the sale of Health-Chem stock, you must also find that the information directed to consumers, was part of a course of business or scheme, in violation of the rule. If it was not, you may not consider those alleged misstatements or ommissions [sic] in deciding whether defendants engaged in any act, practice or course of business, device, scheme, or artifice to defraud plaintiff.

While we can never say with certainty how a jury understood a particular charge, the purpose of this language was to explain how misstatements directed to consumers could form the basis for a 10b–5(a) or (c) liability. The charge, however, does not exclude a finding of liability based on misstatements that are themselves intended to mislead investors. As the subsequent paragraph of the charge makes evident, this part of the charge did not require a finding of a scheme as a precondition of liability, but simply distinguished consumer fraud from securities fraud.[20]

The dissent also concludes that the district court excluded the possibility of rule 10b–5(b) liability in instructing the jury: "The question is whether defendants made any material misrepresentations or ommissions [sic] to consumers as part of a scheme in order to artificially inflate the price at which Health-Chem stock was [trading]." Here, again, the district court was defining the difference between consumer and securities fraud in its explanation of the scienter and the fraud on the market elements of a 10b–5 action. It was

---

**20.** "In other words, even if you should determine I'm not suggesting you should or should not so determine but even if you should determine that defendants promoted and sold a product, and that product was a bad product and they knew it was a bad product, and nonetheless they went ahead in such a way to intentionally defraud consumers, if you should find that, that fact standing by itself cannot be a basis for holding defendants liable in this case."

not excluding single acts of misrepresentation. We simply do not see what the charge required plaintiffs to prove that would not be part of their burden in a rule 10b–5(b) action. In fact, liability under the "scheme" or "course of conduct" language of the rule might be based on a series of minor misrepresentations that artificially inflate the stock price only when taken together. *See Blackie v. Barrack,* 524 F.2d 891, 903 (9th Cir.1975). The jury found no liability after presumably considering each and all of the alleged misstatements.

In sum, we believe the assumed error of the district court in taking the 10b–5(b) assumed claim from the jury was harmless because none of plaintiffs' evidence was excluded and the jury's determinations on the (a) and (c) claims necessarily excluded any factual basis for liability on the (b) claim.

## V. *Conclusion*

For the reasons set forth above, the judgment of the district court will be affirmed in all respects.

JUDGE BECKER'S SEPARATE DISSENTING STATEMENT ON THE PRECLUSIVE EFFECT OF THE JURY VERDICT

The majority correctly notes that the district court stated that the jury might consider "whether the defendants made any untrue statement or statements of material fact or omitted to state any material fact or facts." The court never instructed the jury, however, that a *single* misstatement or omission could constitute a violation of rule 10b–5. On the contrary, the court gave the jury the clear impression that, while it was to consider the making of misrepresentations or omissions, such acts could violate the rule only if they were part of some larger scheme or course of activity. The district court explained to the jury that the question was "whether defendants made any material misrepresentations or

ommissions [*sic*] to consumers *as part of a scheme* in order to artificially increase the price at which Health-Chem stock was selling." App. at 1950. (Emphasis added.) Moreover, immediately after mentioning "any untrue statement" and "any material fact," the court reminded the jury that the plaintiffs were contending "that *part of the fraud* was the making of such statements." *Id.* This statement supports the impression that a scheme was required.

In *Ayoub v. Spencer,* 550 F.2d 164 (3d Cir.1977), we reversed a jury verdict for defendant in a medical malpractice case because the relationship between proximate cause and contributory negligence was not laid out for the jury with sufficient clarity in the jury instructions. Although some language in the instructions stated the law on this issue properly, we believed that "[t]his [issue] should have been made perfectly clear to the jury." Reversal was deemed appropriate because "[w]e [were] convinced that the issue was not properly clarified for the jury and that confusion may have resulted to appellant's prejudice." 550 F.2d at 168. Application of that standard here requires us to reverse and remand for a new trial on the 10b–5(b) issue. While the question of whether or not defendants made a single misstatement or omission which damaged plaintiffs was contained in the jury instructions, I am convinced that it was not expressed with sufficient clarity. Rather the clear impression is that a scheme was required. At the very least, "confusion *may* have resulted to appellant's prejudice" on the issue. Under these circumstances plaintiffs' rule 10b–5(b) claim cannot be said to have been rejected by the jury. I therefore believe a retrial is required.

As the majority points out, careful scrutiny of the charge allows the interpretation that the court distinguished between frauds perpetrated on investors from those perpetrated on consumers, and that it instructed the jury it need find a scheme only with respect to the former. One might

then argue that the jury's finding of no liability under rules 10b–5(a) and 10b–5(c) implies that it found no material misrepresentations or omissions directed toward investors, and thus that there could be no liability under rule 10b–5(b). This argument is not explicitly made by the defendants or the majority, and I would reject if it were. Although close, patient reading of the charge might permit this interpretation, the jury only heard the charge; it did not have the opportunity to read and analyze it at its leisure. To be absolutely fair on the appeal, one must consider what the jury would have understood by the charge, and for the reasons I have stated, I believe that the overwhelming effect of the charge would have been that the jury would have believed that a finding of a scheme was a predicate to a finding of liability.

Defendants make two other arguments which the majority does not address but which, in the interests of completeness, I feel constrained to consider. First, defendants argue that even if the jury did understand that a scheme was necessary to liability on the rule 10b–5(a) and rule 10b–5(c) claims, the jury verdict on these "scheme" claims logically included a finding for defendants on the rule 10b–5(b) claim. This argument is incorrect because a *scheme* to defraud involves more elements than a single material misrepresentation or omission, although such a scheme may be composed of a series of material misrepresentations and omissions. Thus, the question whether Health-Chem made *any* misstatement or omission was not "necessary to the outcome of the jury verdict," *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979), and a finding of material misstatements or omissions sufficient for liability under 10b–5(b) would not be inconsistent with the verdict on 10b–5(a) and 10b–5(c).

Finally, defendants raise another, and slightly different argument based on the relationship between clauses (b) and (c) of rule 10b–5. Defendants contend that, as

clause (c) prohibits *"any act"* that defrauds a purchaser, it is a "catch-all" and a verdict in favor of a defendant on clause (c) necessarily encompasses all rule 10b–5 claims. This point is problematic. As has been noted, the distinction between parts (a), (b) and (c) of rule 10b–5 is far from clear. One obvious problem with defendants' proposed reading of rule 10b–5(c) is that it would make clause (b) (and possibly clause (a) as well) superfluous. I would hesitate before reaching this uncomfortable result. Even if this contention is correct, however, it is irrelevant here because *according to the district court's charge to the jury* clause (c) is not a catch-all, but requires a scheme to defraud, *see supra.* Thus, whether or not defendant is correct about the relationship between clauses (c) and (b), this much is certain: (1) a plaintiff can prevail on a rule 10b–5 claim without establishing a scheme; and (2) given the jury charge, plaintiffs could have prevailed only if they established a scheme.

In sum, I believe that plaintiffs' rule 10b–5(b) claim cannot be said to have been rejected by the jury. I conclude not only that the district court erred in granting a directed verdict for defendants with respect to the 10b–5(b) claim, *see supra* part III, but also that the jury verdict on the (a) and (c) claims was not preclusive. I would therefore reverse the judgment and remand for a new trial of the 10b–5(b) claim. I also would reinstate the class action certification with respect to that cause of action.