**In re CHAMBERS DEVELOPMENT SECURITIES LITIGATION.**

**This Document Relates to:**
**All Class Actions.**

**Civ. A. No. 92–0679.**
**MDL 982.**

United States District Court,
W.D. Pennsylvania.

Feb. 23, 1994.

Howard A. Specter, George G. Mahfood, Specter Law Offices, P.C., Pittsburgh, PA, Arthur N. Abbey, Mark C. Gardy, Joshua N. Rubin, Abbey & Ellis, Marian Rosner, Wolf Popper Ross Wolf & Jones, New York City, Stuart H. Savett, Barbara A. Podell, Savett Frutkin Podell & Ryan, P.C., Philadelphia, PA, Jerome M. Congress, Steven G. Schulman, Milberg Weiss Bershad Hynes & Lerach, New York City, Michael P. Malakoff, Richard A. Finberg, Malakoff Doyle & Finberg, Pittsburgh, PA, Barrack Rodos & Bacine, Stanley R. Wolfe, Todd S. Collins, Berger & Montague, Philadelphia, PA, Jeffrey N. Bernstein, Manhasset, NY, Bernstein Litowitz Berger & Grossman, Brager & Wexler, P.C., New York City, Daniel A. Edelman,

Law Offices of Daniel A. Edelman, Chicago, IL, Arthur M. Kaplan, Donald L. Perelman, Fine, Kaplan and Black, Philadelphia, PA, Joseph Goldberg, Freedman, Boyd, Daniels, Peifer, Hollander, Guttman & Goldberg, Albuquerque, NM, Garwin Bronzaft Gerstein & Fisher, New York City, Kenneth Gilman, Gilman & Pastor, Boston, MA, E. David Margolis, Gismondi & Margolis, Pittsburgh, PA, Lawrence A. Sucharow, Jonathan M. Plasse, Emily C. Komlossy, Goodkind Labaton Rudoff & Sucharow, New York City, C. Oliver Burt, III, Burt & Pucillo, Haverford, PA, Martin E. Grossman, Bala Cynwyd, PA, Kaufman Malchman Kaufmann & Kirby, New York City, Lynn Lincoln Sarko, Keller Rohrback, Seattle, WA, Stanley D. Bernstein, Kreindler & Kreindler, Thomas A. Holman, Sam Schwartz, Lefrak Newman & Myerson, New York City, Arnold Levin, Levin Fishbein Sedran & Berman, Philadelphia, PA, Daniel C. Girard, Lieff, Cabraser & Heimann, San Francisco, CA, Richard Bemporad, Lowey Dannenberg Bemporad & Selinger, P.C., New York City, Gene I. Mesh, Gene Mesh & Associates, Cincinnati, OH, Meredith & Cohen, Philadelphia, PA, Michael J. Freed, Michael B. Hyman, Much Shelist Freed Denenberg & Ament, P.C., Chicago, IL, Alfred E. Nugent, Law Offices of Alfred E. Nugent, Boston, MA, Ostrager & Chong, New York City, Gregg M. Rosen, Sable Makaroff & Gusky, Pittsburgh, PA, Schoengold & Sporn, P.C., New York City, Harris J. Sklar, Philadelphia, PA, Law Offices of C. Crady Swisher III, C. Crady Swisher, Pittsburgh, PA, Wechsler Skirnick Harwood Halebian & Feffer, Joseph H. Weiss, Law Offices of Joseph H. Weiss, Fred Taylor Isquith, Wolf Haldenstein Adler Freeman & Herz, New York City, Alfred G. Yates, Jr. & Associates, John Thomas, Zimmer Kunz Loughren & Hart, Pittsburgh, PA, John T. Murray, Murray & Murray, Sandusky, OH, Larry Feldman, Feldman & Carlitz, Elkins Park, PA, Terrence Buehler, Susman Saunders & Buehler, Chicago, IL, for plaintiff.

William W. Wycoff, David G. Ries, Craig E. Frischman, Thorp Reed & Armstrong, Pittsburgh, PA, Leon P. Gold, Mark E. Davidson, James M. Markowski, Proskauer Rose Goetz & Mendlesohn, New York City, for Chambers Development Co. and the individual defendants.

Richard R. Nelson, II, Cohen & Grigsby, Pittsburgh, PA, for Grant Thornton.

Joseph McDonough, Manion McDonough & Lucas, P.C., Pittsburgh, PA, for Richard Knight.

David A. Brownlee, Michael J. Lynch, Kirkpatrick & Lockhart, Pittsburgh, PA, for Kidder Peabody & Co., Inc., Kidder Peabody Intern. Ltd., Dean Witter Reynolds, Inc., First Analysis Securities Corp., Swiss Bank Corp. and SBCI Swiss Bank Corp. Investment Banking, Inc.

J. Tomlinson Fort, John H. Demmler, Robert D. Anderle, Reed Smith Shaw & McClay, Pittsburgh, PA, for John M. Arthur and William E. Moffett.

Bernard D. Marcus, Robert L. Allman, II, Robert M. Barnes, Marcus & Shapiro, Pittsburgh, PA, for Michael J. Peretto.

## OPINION OF THE COURT

LEE, District Judge.

Before the Court are multiple motions to dismiss plaintiffs' Amended Consolidated Class Action Complaint (Document No. 44) (the "Amended Complaint") for various reasons, including plaintiffs' purported failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6); plaintiffs' untimely service of the Amended Complaint upon certain defendants, pursuant to Fed.R.Civ.P. 4(j); and failure to plead fraud with the particularity required by Fed. R.Civ.P. 9(b). After consideration of the various motions and responses, the memoranda in support and in opposition and the oral presentations of counsel, these motions to dismiss will be denied.

For purposes of these motions, the Court must accept as true all facts alleged in the Amended Complaint, and draws all reasonable inferences in plaintiffs' favor. *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993). Viewed in that light, the Amended Complaint sets forth the following relevant facts.

The initial Consolidated Class Action Complaint was filed on March 18, 1992. On June 29, 1992, this Court entered Pretrial Order No. 1 by consent of the parties (Document No. 18) which, *inter alia,* consolidated 18 separate related actions that had been filed in the Western District of Pennsylvania at Civil Action No. 92–0679, designated *"In re Chambers Development Securities Litigation."* There are now 21 related actions from this district and one related case has been transferred to this Court from the Eastern District of Arkansas by the Judicial Panel on Multidistrict Litigation which designated this litigation as appropriate for consolidated pretrial proceedings at MDL 982 in the Western District of Pennsylvania, pursuant to 28 U.S.C. § 1407. Two other related cases have also been filed in this district, one of which (CA93–0354) will be consolidated for pretrial proceedings; the other (CA93–0528) will be dismissed under separate order.

The Amended Complaint was filed on November 4, 1992, on behalf of nearly 50 named plaintiffs individually and as representatives of a large, presently unknown number of similarly situated purchasers (perhaps "thousands") of securities of the Chambers Development Company, Inc. ("Chambers") during the class period from March 18, 1988, through October 20, 1992, excluding the defendants, immediate family members of the individual defendants and corporate affiliates. AC,[1] ¶¶ 6, 36, 39. Plaintiffs bring this action pursuant to sections 11, 12(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l* (2) and 77*o*; sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the Securities and Exchange Commission's ("SEC's") Rule 10b–5, 17 C.F.R. § 240.10b–5; and the common law of Pennsylvania.

### The Defendants

Chambers, a Delaware corporation having its principal executive offices in Pittsburgh, Pennsylvania, is in the business of solid waste management and provides services to its commercial, residential and business customers for the collection, hauling and disposal of solid waste. AC, ¶ 7(a). Chambers also engineers, constructs, manages and operates solid waste sanitary landfills and, through a subsidiary, provides security and investigative services. AC, ¶ 7(a).

Chambers is sued as primary violator of section 10(b) of the Exchange Act, and SEC Rule 10b–5 and as an issuer under section 11 of the Securities Act, 15 U.S.C. § 77k, as to three public securities offerings accompanied by Registration Statements and Prospectae, namely: the "1989 Debenture Offering," the $110,000,000.00 Convertible Debenture[2] Offering of September 21, 1989; the "1989 Stock Offering" of 2,850,000 shares of Chambers' Class A common stock at $25.00 per share, dated April 19, 1989; and the "1991 Stock Offering" of 6,100,000 shares of Chambers Class A common stock at $24.875 per share, dated June 13, 1991. ¶ 7(c).

Each Convertible Debenture was convertible by its holder into Class A common stock at $42.25 per share (later adjusted to $21.125 per share following a two for one split), and was redeemable by Chambers at any time subject to the holder's agreement and a declining premium starting at 6.75% over face value. AC, ¶ 76. In August of 1991, Chambers announced its intention to redeem the debentures effective September 16, 1991. AC, ¶ 96. Virtually all debenture holders converted them into 5,206,988 shares of Class A common stock prior to the redemption date because the market price of Class A common at that time was greater than the face amount of the debentures plus the premium. AC, ¶ 97.

Grant Thornton is a professional firm of certified public accountants and auditors with offices in Pittsburgh, Pennsylvania. Until April 13, 1992, Grant Thornton was Chambers' independent certified public accountant and auditor at all times relevant, specifically with respect to financial statements, annual reports and SEC Form 10–Ks for the years 1987–1990 inclusive. Grant Thornton con-

---

**1.** "AC" references the Amended Consolidated Class Action Complaint.

**2.** A debenture is a long-term, unsecured debt security. *Lorenz v. USX Corp.,* 1 F.3d 1406, 1408, n. 1 (3d Cir.1993).

sented to the use of its name in Chambers' Registration Statements and Prospectae pertaining to the debenture and stock offerings, and certified the accuracy of the 10–K Forms, annual reports and underlying schedules thereto as Chambers' independent public auditor. Grant Thornton is sued as a primary violator of section 10(b) of the Exchange Act and SEC Rule 10b–5, and as an aider and abettor, as well as in its capacity as Chambers' public accountant under section 11(a)(4) of the Securities Act. AC, ¶ 8.

The Amended Complaint also names four individual managing partners of Grant Thornton, Richard Stewart, David Abramson, Domenic Esposito and Charles R. Fallon, as defendants. Mr. Fallon is the managing partner in Grant Thornton's Pittsburgh, Pennsylvania, office, and the others are managing partners in Los Angeles, California, Minneapolis, Minnesota, and New York, New York, respectively. These named partners of Grant Thornton are sued both in their individual capacities and as representative defendants of a putative defendant class of more than 250 Grant Thornton partners located throughout the United States. AC, ¶¶ 9–13, 51–56.

*Individual Chambers Directors and Officers*

Defendant John G. Rangos, Sr. ("J. Rangos, Sr.") was, at all relevant times, the President, Chief Executive Officer, Chairman of the Board of Directors and major shareholder of Chambers. J. Rangos, Sr., signed SEC 10–Q Forms, for nine quarters during the class period, 10–K Forms for the fiscal years ending December 31, 1989 and 1990, and all Registration Statements accompanying the three public offerings. AC, ¶ 14.

Defendant Alexander W. Rangos ("A. Rangos") was at all relevant times an Executive Vice President and member of the Board of Directors of Chambers, and John G. Rangos, Jr. ("J. Rangos, Jr.") was Executive Vice President, Secretary and member of the Board. These defendants, also major stockholders, authorized their father, J. Rangos, Sr., to sign the Registration Statement on their behalf for the 1989 Debenture Offering, and they personally signed the Registration Statements accompanying the 1989 and 1991

Stock Offerings and the 10–K Forms for fiscal years 1989 and 1990. AC, ¶ 15. Plaintiffs allege that A. Rangos sold 100,000 shares of Class A common stock in the 1991 Stock Offering while in possession of non-public, materially adverse information. AC, ¶ 15, 16.

Defendants, Michael J. Paretto, John M. Arthur, William E. Moffett, William R. Nelson and Hugh Scott were at all times members of the Board of Directors of Chambers who consented to the use of their names as Directors in connection with the three public offerings, and who either personally signed, or authorized J. Rangos, Sr., to sign on their behalf, some or all of the Registration Statements accompanying said public offerings and the 10–K Forms for fiscal years 1989 and 1990. AC, ¶¶ 17–21.

Defendant Frank D. Hutchinson was a member of the Board of Directors of Chambers at all times relevant to the 1989 Debenture and Stock Offerings. He authorized J. Rangos, Sr., to sign the Registration Statement for the 1989 Debenture Offering and the 10–K Form for fiscal year 1989 in his behalf, and he personally signed the Registration Statement accompanying the 1989 Stock Offering. He also consented to the use of his name as being a Director in connection with these two offerings. AC, ¶ 22.

Defendant Richard A. Knight was a member of the Board of Directors of Chambers and its Executive Vice President in charge of Finance (Chief Financial Officer, or "CFO") from August 1990 until on or about April 13, 1992, when he was fired as CFO. From 1976 until 1990, Mr. Knight, then the managing partner of Grant Thornton's Pittsburgh office, was head of the Chambers account team. Knight was responsible for Grant Thornton's signature on the 1989 Debenture Offering and annual independent audits of Chambers' financial statements and reports performed prior to the time that he was hired by Chambers as its CFO. Knight signed several 10–Q Forms in 1990 and 1991, a 10–K Form for fiscal year 1990, the Registration Statement accompanying the 1991 Stock Offering, and he consented to the use of his name as a Director of Chambers in connection with that offering. AC, ¶ 23.

Defendant John J. Cushma was the Corporate Controller of Chambers at all relevant times who authorized J. Rangos, Sr., to sign the Registration Statement accompanying the 1989 Debenture Offering on his behalf, and who also personally signed the Registration Statements accompanying the 1989 and 1991 Stock Offerings, several 10–Q and 10–K Forms for fiscal years 1989 and 1990. AC, ¶ 24. Defendant Joseph G. Stotlemeyer was Chambers' Vice President–Corporate Security and Support Services and a Director since May of 1990, and he signed the 1990 10–K Form and consented to use of his name as being a member of the Board of Directors in connection with the 1991 Stock Offering. AC, ¶ 25.

J. Rangos, Sr., A. Rangos, J. Rangos, Jr., Nelson, Knight and Cushma are alleged to be "controlling persons" within the meaning of section 20(a) of the Exchange Act.[3] Each is alleged to have violated his duty to disseminate complete, accurate and truthful information regarding Chambers' financial condition and to correct promptly any public statements that subsequently became false and misleading, and each is alleged to be liable under sections 10(b) and SEC Rule 10b–5 and section 20(a) of the Exchange Act as primary violators, as controlling persons and as aiders and abettors. AC, ¶ 26.

J. Rangos, Sr., A. Rangos, J. Rangos, Jr., Paretto, Arthur, Moffett, Scott and Cushma

are allegedly liable to the plaintiff class under section 11 of the Securities Act for their consent to the use of their names as Directors and their signatures on the various Registration Statements accompanying the three public offerings, and as "controlling persons" pursuant to section 15 of the Securities Act.[4] AC, ¶ 27–28. Defendants Nelson and Hutchinson are allegedly liable with regard to the 1989 Debenture Offering and 1989 Stock Offering, AC, ¶ 29, and Knight and Stotlemeyer with respect to the 1991 Stock Offering. AC, ¶ 30.

### The Underwriter Defendants

The Amended Complaint identifies six domestic or foreign corporations conducting business as broker-dealers and investment advisors who participated in the public securities offerings as "underwriters" as that term is used in section 11(a)(5) of the Securities Act,[5] 15 U.S.C. § 77k(a)(5), and/or as managing underwriters for one or more of the offerings. AC, ¶¶ 31–37.

Kidder, Peabody & Co., Inc., ("Kidder Peabody"), Dean Witter Reynolds, Inc. ("Dean Witter") and First Analysis Securities Corporation ("First Analysis") are all sued individually and as putative class representatives for the groups of 58 underwriters of the 1989 Stock Offering and 35 underwriters of the 1991 Stock Offering, and are sued

---

3. Section 20(a) of the Exchange Act provides: Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

 15 U.S.C. § 78t(a).

4. Section 15 of the Securities Act provides: Every person who ... controls any person liable under sections 77k [section 11] or 77l [section 12] of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

 15 U.S.C. § 77o.

5. Section 2(11) of the Securities Act defines "underwriter" as:

 [A]ny person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

 15 U.S.C. § 77b(11).

individually as the only three underwriters of the 1989 Debenture Offering, under section 11(a)(5) of the Securities Act, and as aiders and abettors of the section 10(b) of the Exchange Act/Rule 10b–5 violations. AC, ¶¶ 31–34.

Additionally, Kidder Peabody International Limited ("Kidder International") Swiss Bank Corporation ("Swiss Bank") and SBCI Swiss Bank Corporation Investment Banking ("SBCI") are sued as underwriters of public offerings under section 11(a)(5), and as aiders and abettors of a violation of section 10(b)/Rule 10b–5, for their participation as managing underwriters of the 1991 Stock Offering having "due diligence" responsibilities for the group of underwriters participating in that offering. AC, ¶¶ 35–37.

With respect to their claims under section 11 of the Securities Act, plaintiffs request certification of a class of defendants consisting of the 35 underwriters participating in the 1991 Stock Offering and the 58 underwriters participating in the 1989 Stock Offering, with Kidder Peabody, First Analysis, Dean Witter and SBCI named as the representatives of those classes. AC, ¶¶ 43–50.[6]

### Substantive Allegations

Paragraphs 57–148 of the Amended Complaint set forth detailed and specific averments regarding allegedly false and misleading statements and omissions of material facts made by Chambers' officers and directors and by Grant Thornton throughout the class period. Essentially, plaintiffs claim defendants falsely presented Chambers to the investing public as a dynamic, financially secure company consistently making dramatic profits prior to and during the class period when, in fact, it never made a profit and purposefully hid its actual losses and true net worth through improper "creative" accounting methods that were, until early 1992, publicly approved by Grant Thornton. Plaintiffs' "overview" states that, in various 10–Q and 10–K Forms and annual reports, incorporated into its Registration Statement and Pros-

pectae, Chambers reported steadily and sharply increasing earnings from 1986 to 1991. For example, in 1986 Chambers reported $6.8 million before tax earnings and $5.1 million net after tax earnings, which grew to earnings of $56.8 million and $34.4 million, respectively, in 1990. AC, ¶¶ 58–59.

These earnings were, according to plaintiffs,

> materially false and misleading, and omitted to state the material facts that the Company through improper accounting practices, had since 1985 capitalized millions of dollars of expenses that should have been treated as expenses and employed other improper accounting techniques in violation of GAAP [Generally Accepted Accounting Principles].... Chambers had in fact suffered a loss in each such year. Chambers actually had a negative net worth at various critical times [preceding] its Public Offerings during the Class Period.... This information was concealed from the plaintiffs and the other members of the Class throughout the Class Period. The true facts did not begin to be revealed until after the close of the market on March 17, 1992, and have not yet been fully revealed.

AC, ¶ 61.

### The Allegedly Improper Accounting Policy and Practices

Plaintiffs claim Chambers' management "cooked" their books from at least 1985 through 1992 with Grant Thornton's active participation. The chief offending accounting policy, capitalizing millions of dollars of indirect expenses of landfill development as assets instead of as operating expenses charged against income in the year incurred, is said to be unique and completely inappropriate to the landfill/solid waste disposal industry and to have artificially enhanced Chambers' financial picture, and the market value of its securities. These indirect expenses included executive salaries, portions of general overhead and public relations

---

6. Kidder Peabody, First Analysis and SBCI are designated the representatives of the subclass of 35 underwriters involved in the 1991 Stock Offering; Kidder Peabody, First Analysis and Dean Witter are designated as the representatives of the subclass of 58 underwriters involved in the 1989 Stock Offering. AC, ¶¶ 44–46.

costs. *Id.* Several other accounting practices are also challenged as being well outside the acceptable norms of the accounting profession, including the failure to treat as expenses substantial amounts of interest expense when Chambers restated its 1991 financial statements on March 17, 1992, and duplicating (double counting) deferrals and capitalizations of certain landfill development costs for several years, both of which practices further overstated earnings and inflated net worth. AC, ¶¶ 107–08, 116–19.

Annual reports and 10–K Forms for the years 1988–1990 allegedly contained explicit representations by Grant Thornton that Chambers' financial statements fairly presented its consolidated financial position and verified the results of Chambers' operations and cash flows "in conformity with generally accepted accounting principles," *e.g.*, AC, ¶ 68, and that Grant Thornton's audits were "conducted ... in accordance with generally accepted auditing standards," ("GAAS"), *e.g.* AC, ¶ 79. Plaintiffs summarize Grant Thornton's involvement in ¶ 101 of the Amended Complaint:

> Grant Thornton audited the financial statements contained in each of the Annual Reports and Forms 10–K during the Class Period, which Financial Statements appear in, or are exhibits to, the Prospectuses referred to herein, and consented to the use of its name as an accountant reporting on the financial statements. In every instance, Grant Thornton provided a "clean" opinion, which was "unqualified" as to the Company's treatment of expenses, which stated that Grant Thornton conducted its audit "in accordance with [GAAS] and, that in Grant Thornton's opinion, the financial statements presented fairly, in all material respects, the consolidated financial position of Chambers and its subsidiaries, the results of their operations and their consolidated cash flows during the relevant periods "in conformity with [GAAP]."

AC, ¶ 101.

In letters to shareholders attached to annual and quarterly reports and in other public announcements during the class period, J. Rangos, Sr., allegedly touted the substantial financial achievements of Chambers and its status as "one of the fastest growing solid waste companies in America," and raved about Chambers' "record" sales and profits, "substantial financial growth," and rosy predictions about the "outstanding results" and "significant growth" expected in the coming years. *E.g.*, AC, ¶¶ 78, 85–87, 90–91, 100.

Plaintiffs allege the Chambers defendants knew or recklessly disregarded that its unique accounting policy regarding capitalization of indirect landfill development expenses and other accounting practices and policies violated GAAP, AC, ¶¶ 136–143, and that Grant Thornton's various financial reports were materially false and misleading in falsely stating that its audits were conducted in accordance with GAAS. AC, ¶¶ 144–46. Furthermore, capitalization of such indirect costs to landfill and other developmental activities was not supported by contemporaneous time sheets or other supporting material, as required by GAAP, and the amount of capitalized interest which was based on the amount of capitalized costs was excessive under GAAP. AC, ¶¶ 139–142.

Plaintiffs identify the GAAP violations with references to specific Accounting Principles Board Statements and Financial Accounting Standards Board Statements. AC, ¶¶ 136–143. One of the major GAAP transgressions claimed is the failure of Chambers and Grant Thornton to disclose that the unique accounting policy regarding landfill expense capitalization, even if arguably proper, was adopted and applied, even though

> the virtually universal industry practice was to expense and not to capitalize such indirect costs. Consequently, capitalizing such costs *without disclosing such accounting practice confused and deceived the investing public.* Among other things, that nondisclosure was materially misleading with respect to the profitability of Chambers compared with its major competitors. The failure to disclose that Chambers had adopted such an accounting policy violated Opinion No. 22 of the Accounting Principles Board, "Disclosure of Accounting Policies." APB No. 22 states that "a description of all significant accounting policies of the reporting entity should be included as an integral part of

the financial statements." It further states:

> Disclosure of accounting policies should identify and describe the accounting principles followed by the reporting entity and the methods of applying those principles that materially affect the determination of the financial position, changes in financial position, or results of operations. In general, the *disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods....*

AC, ¶ 137(f) (Emphasis added).

Disclosure should include "existing acceptable alternatives," the principles and methods "peculiar to the industry even if such principles and methods are predominantly followed in that industry," and any "unusual or innovative applications" of GAAP. *Id.*

Plaintiffs allege all defendants knew or recklessly disregarded that Grant Thornton's audit reports were materially false and misleading in stating it had conducted the audits in accordance with GAAS, including: Standard of Field Work No. 3 (an "auditor must obtain sufficient competent evidential matter to afford a reasonable basis for expressing an opinion"); General Standard No. 2 (auditor must, in all matters relating to the assignment, maintain an independence in mental attitude); American Institute of Certified Public Accountants ("AICPA") Principles of Professional Conduct, Article IV (a member in public practice should be independent in fact and appearance when providing auditing and other certification services); and General Standard No. 3 (requiring due professional care be exercised in the performance of an audit in preparation of a report). AC, ¶¶ 144–46.

*St. Patrick's Day 1992 and its Aftermath*

On March 17, 1992, Chambers publicly announced "it revised its 1991 after-tax earnings downward to $1.6 million (or 3 cents per share) from the previously reported after-tax earnings for 1991 of $49.9 million (or 83 cents per share)." AC, ¶ 102. Plaintiffs suggest this announcement resulted from the refusal

of the new team of Grant Thornton auditors, installed after defendant Knight and two other Grant Thornton accountants went over to Chambers, "to sign off on Chambers' 1991 financial statements." AC, ¶ 102. This revision was made to properly record the indirect landfill development expenses as costs rather than capitalizing them, and included a charge to 1991 earnings to reflect the effect on reported earnings from 1985 forward. AC, ¶ 103. Chambers, however, stated that it was adopting the change in its accounting practices "to recognize ever increasing operational aspects of its business ... [and that] because of its growth, identification and allocation of these indirect expenses had become increasingly complex." AC, ¶ 108.

Following this announcement, the bottom fell-out of the market for Chambers' Class A common stock, the price of which dropped from $30½ on March 17, to a closing price of $11½ per share on March 18, 1992. AC, ¶ 106. On April 13, 1992, Chambers issued another press release stating that its revised 1991 earnings reported on March 17, 1992 ($.03 per share) had been overstated and Chambers no longer believed that its 1991 earnings would "be as much as the $.03 per share previously announced." AC, ¶ 113. Eventually, Chambers' "accounting adjustments" as of October 1992 necessitated a $362 million charge against its accumulated earnings for 1991 and prior years. AC, ¶ 121.

Grant Thornton was fired as Chambers' public accountant and Knight dismissed as CFO on April 13, 1992, although he remains a member of the Board of Directors. AC, ¶¶ 114, 117. On April 22, 1992, Chambers filed an SEC 8–K disclosure Form setting forth several events relating to the company's termination of Grant Thornton as its accountant. AC, ¶ 116. Grant Thornton filed an Amendment to the 8–K Form and sent a letter to the SEC dated April 23, 1992, which declared there had been a sudden point of demarcation with Chambers' accounting policies and practices that had been previously endorsed by the Knight-led team. AC, ¶¶ 116–117. Plaintiffs quote lengthy excerpts of this letter in their complaint, portions of which are as follows:

Beginning in January 1992, we began to inform the Company that we had serious concerns and questions.... Among other matters, we pointed out that when a company has significant operations, certain overhead or indirect costs are difficult to specifically identify and directly attribute to development activities. Accordingly, companies with substantial operations usually routinely charge such costs to operations and we suggested it would be preferable for the Company to limit its capitalization to those costs clearly and directly identifiable with landfill and other developmental activities, such as labor, engineering and permitting.

We also pointed out that, when Company personnel work on both operating and development activities; capitalized costs should be supported by contemporaneous time sheets or other supporting details and that we had been surprised and disappointed because the Company had agreed to install such a system for fiscal year 1991. . . .

 . . . . .

Later in the meeting, we ... pointed out that part of our difficulty in obtaining audit satisfaction related to certain indirect costs which they had allocated between development activities and operations. We repeated what we had told them before: such allocation becomes increasingly difficult and unjustifiable as operations mature. Most mature operating companies therefore expense such costs rather than attempt to identify the portion allocable to development activities....

 . . . . .

### Discussions with Corporate Controller, April 13, 1992

At approximately 9:00 AM April 13, 1992, we advised John Cushma, Chambers' Corporate Controller, that we believed the Company's determination of its 1991 capitalized costs might have included duplicate items. Based on inquiries of several operating personnel concerning this, it had begun to appear increasingly likely that the items had in fact been duplicated, which would reduce the Company's net earning

by approximately $4,000,000 and result in a net loss for the year. It appears that the Company was aware of the possible duplication for some period of time and had not previously informed us. Before we could seek additional information or conclude on the matter, at approximately 10 AM we were told that the Company wished us to suspend our audit and vacate the premises. AC, ¶ 117.

Finally, plaintiffs allege that throughout the class period, the market for trading in Chambers' securities on the American Stock Exchange was "efficient, open and well-developed. The market price of Chambers' securities reacted promptly to disclosure of material information that was not previously disclosed or anticipated. In purchasing Chambers' securities, plaintiffs and the other members of the class relied on the integrity of the offering process, and/or the regulatory process, and/or the market both as to price and as to whether these securities were marketable in the first instance." AC, ¶ 148(a). On October 20, 1992, Chambers' Class A common stock closed at $6.25 per share. AC, ¶ 148(b)

### The Causes of Action

Count I—Section 10(b) of Exchange Act.

Count I, AC ¶¶ 149–162, alleges all defendants have violated sections 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b) and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, (hereinafter the "section 10(b) violation") for their respective involvement in a scheme to artificially inflate the market price of Chambers securities by misstating and concealing material information regarding its earnings, net worth and financial condition, its improper accounting practices and its consistently exaggerated financial projections. AC, ¶¶ 150–51, 153.

In the penultimate paragraph regarding the individual defendants' liability at Count I, plaintiffs allege that J. Rangos, Sr., A. Rangos, J. Rangos, Jr., Nelson, Knight, Stotlemyer and Cushma were members of management who adopted and implemented Chambers' accounting policy to capitalize indirect costs of landfill development, aware that such

costs were "not normally capitalized in the waste disposal industry," and that these seven defendants informed the non-management directors/defendants, Paretto, Arthur, Moffett and Scott, at Board meetings and elsewhere of that unique accounting practice and of its impact on Chambers' financial condition. AC, ¶ 154. Plaintiffs further claim all the individual Chambers defendants directly or indirectly controlled "the content of the public statements and financial statements disseminated by Chambers," knew or recklessly disregarded that there was no reasonable basis for allocating indirect expenses to the costs of landfill development and knew or recklessly disregarded that Chambers' annual and quarterly financial statements were materially misleading in artificially inflating its income and assets and understating expenses, and were materially deceptive in failing to disclose gross deviations from GAAP. AC, ¶ 154.

As to Grant Thornton, plaintiffs allege the professional accounting firm and its partners knowingly or recklessly made material misrepresentations and omissions of fact in the audit opinions and financial reports which Grant Thornton prepared in 1987–1990, that the financial statements falsely stated that Chambers' accounting policies and practices complied with GAAP and Grant Thornton's independent audits complied with GAAS when, in fact, they did not. AC, ¶ 155. Plaintiffs assert defendant Knight became Chambers' CFO in 1990 after heading the Grant Thornton team which previously handled the Chambers' account, and that Knight brought with him at least two other accountants, demonstrating Grant Thornton's failure to maintain independence. *Id.*

The defendant Underwriters are alleged to have knowingly or recklessly acquiesced-in and failed to publicly disclose the "unusual and deceptive accounting practices by which the public was misled as to Chambers' earnings, expenses and business prospects" and failed in their duty to require that Chambers correct its misleading Registration Statements, Prospectae and financial statements or disclose its unique accounting practices regarding capitalization of landfill expenses. AC, ¶ 158.

Plaintiffs claim they and the other members of the class purchased Chambers' securities in reliance on the integrity of the market at prices artificially inflated because of defendants' deceptive practices and false and misleading statements and omissions, and seek damages from all defendants resulting from their direct participation in and aiding and abetting the section 10(b) violation. They also claim "controlling persons" liability of all defendants under section 20(a) of the Exchange Act.

Count II—Section 11 of Securities Act

Count II is brought by plaintiffs Blankenship, Blaufield, Goldberg and Muse against all defendants as a putative class action, pursuant to Fed.R.Civ.P. 23, on behalf of all persons who purchased Chambers Convertible Debentures at any time or who purchased Chambers Class A common stock pursuant to the 1989 Stock Offering or the 1991 Stock Offering, or who purchased Class A common stock on the open market that is traceable to the 1989 or 1991 Stock Offerings. AC, ¶¶ 163–64.[7] In this count, plaintiffs assert that each Registration and Prospectus accompanying the three public offerings was materially false and misleading and omitted to state facts necessary to render them not misleading, and that each defendant therefore violated section 11 of the Securities Act: Chambers as an absolutely liable "issuer"; the Underwriters, individually and as purported class representatives of two subclasses of underwriters participating in the stock offerings; Grant Thornton and its individual partners, individually and as class representatives; and the individual Chambers defendants; as persons liable under section 11(a)(1)–(5), 15 U.S.C. § 77k(a)(1)–(5). AC, ¶¶ 167–69. Additionally, the individual

---

**7.** Plaintiff Laura R. Blankenship purchased her convertible debentures on February 15, 1990, pursuant to the 1989 Debenture Offering, and later converted them to 572 shares of Class A common stock; Samuel and Lois Blaufeld purchased 100 shares and Ira Goldberg 250 shares of Class A common stock on April 19, 1989, pursuant to the 1989 Stock Offering; James G. Muse purchased 1,150 shares of Class A common stock on June 13, 1991, pursuant to the 1991 Stock Offering. AC, ¶ 6.

defendants are liable as "controlling persons" pursuant to section 15 of the Securities Act, 15 U.S.C. § 77*o*. AC, ¶ 170.

As provided in section 11, plaintiffs seek damages or rescission.

Count III—Section 12(2) of the Securities Act.

Count III asserts class action claims against the Underwriters pursuant to section 12(2) of the Securities Act, 15 U.S.C. § 77*l*(2), for their participation in the public offerings and violation of their obligations with regard to the Registration Statements and Prospectae, and against the individual defendants as "controlling persons" in connection with the offerings under section 15. AC, ¶¶ 172–81.

Count IV—Negligent Misrepresentation.

Count IV asserts class action claims pursuant to Pennsylvania common law for negligent misrepresentation against all defendants, claiming plaintiffs and the members of the putative class "relied directly or indirectly upon the material misrepresentations and/or the integrity of the market in trading securities of Chambers at the prices paid." AC, ¶¶ 182–88.

## Discussion

■ Recently, my colleague on this Court, the Honorable D. Brooks Smith, set forth many of the pleading standards relevant to the motions before the Court. *In re Westinghouse Sec. Litig.*, 832 F.Supp. 948, 964–66 (W.D.Pa.1993) (Part IV, Pleading Standards). Rather than reinvent the wheel, this Court will set forth that comprehensive statement of the pleading standards, inserting where appropriate additional standards applicable to this litigation:

A. *Rule 12(b)(6)*

When deciding a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the Court must accept as true all facts alleged in the complaint, and view them in the light most favorable to the plaintiff. In order to prevail on a Rule 12(b)(6) motion, the movant must establish that no relief could be granted under any set of facts that the plaintiff could prove.

*Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)....

B. *Rule 9(b)*

Fed.R.Civ.P. 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Under Rule 9(b), a plaintiff must plead

(1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his damage.

*Shapiro v. UJB Financial Corp.,* 964 F.2d 272, 284 (3d Cir.) *cert. denied,* —— U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992)....

Under Rule 9(b), plaintiffs may not simply point to a bad result and allege fraud. Rather, plaintiffs must plead with particularity the circumstances of the alleged fraud in such a way as to inject "precision and some measure of substantiation into their allegations of fraud." *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3d Cir. 1984), *cert. denied,* 469 U.S. 1211 [105 S.Ct. 1179, 84 L.Ed.2d 327] (1985).... By way of example, allegations of "who, what, when, where and how: the first paragraph of any newspaper story," would satisfy the particularity requirement of Rule 9(b).

This stringent particularity requirement, which applies to allegations of securities fraud ... serves three purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations."

The United States Court of Appeals for the Third Circuit has cautioned against permitting "sophisticated defrauders to successfully conceal the details of their fraud." *Christidis [v. First Pennsylvania*

*Mortgage Trust,* 717 F.2d 96, 99–100 (3d Cir.1983) ]. Therefore, courts sometimes relax the rule when "factual information is peculiarly within the defendant's knowledge or control." *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 645 (3d Cir.1989); but a plaintiff who makes such allegations must still provide a "statement of the facts upon which the allegations are based." *Id.*

Finally, Rule 9(b) permits "knowledge and other condition of mind of a person [to be] averred generally." Therefore, plaintiffs need not plead intent to defraud with stringent particularity to permit the inference that the defendants are accused of possessing the requisite scienter to state a cause of action for fraud.

*Westinghouse Sec. Litig.,* 832 F.Supp. at 964–65 (certain citations omitted).

### C. *Rule 12(f)*

■ Under Fed.R.Civ.P. 12(f), the court may strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter," in addition to an "insufficient defense." The movant must show the challenged allegations are so unrelated to the non-movant's claims as to be unworthy of consideration and show prejudice by the presence of such allegations in the pleadings. *Great West Life Assurance Co. v. Levithan,* 834 F.Supp. 858, 862 (E.D.Pa.1993), *citing* 5A Wright & Miller, Federal Practice and Procedure, §§ 1380–81. Motions to strike are generally viewed with disfavor and will not ordinarily be granted in the absence of demonstrable prejudice. *Id.; United States v. Marisol,* 725 F.Supp. 833, 837 (M.D.Pa.1989).

### ■ [D.] *Section 10(b)*

Section 10(b) of the Exchange Act provides: "It shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (1981). SEC Rule 10b–5, promulgated under authority of Section 10(b), makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact" such that prospective purchasers or sellers of securities are misled. 17 C.F.R. Section 240.10b–5 (1992). To state a claim under Section 10(b) and Rule 10b–5, a private plaintiff must plead (1) a false representation of (2) a material (3) fact; (4) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it; (5) the plaintiff's reasonable reliance on defendant's false representation; and (6) the plaintiff's resultant economic loss. *Lewis v. Chrysler Corp.,* 949 F.2d 644, 649 (3d Cir.1991)....

### ■ [E]. *Section 11*

To bring a claim under Section 11 of the Securities Act, a plaintiff must allege that he "acquired" a security which was accompanied by a registration statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein "not misleading." 15 U.S.C. § 77k(a) (1988). Plaintiffs need not allege reliance, scienter or damages, though they must allege that the shares they purchased are traceable to a false or misleading registration statement. *Shapiro,* 964 F.2d at 286.

### ■ [F]. *Section 12(2)*

Section 12(2) of the Securities Act provides that a person who "offers or sells" newly issued securities "by means of a prospectus or oral communication" that misrepresents or omits a material fact "is liable to the person purchasing such security from him" in an initial offering. 15 U.S.C. 77*l* (1988). As with Section 11, plaintiffs need not allege scienter on the part of the defendant, nor must they allege their own reliance on the misstatement or omission. However, in order to state a claim under Section 12(2), plaintiffs must allege that they did not know of the defendants' untruth or omission, and that the defendants knew, or in the exercise of reasonable care, could have known of the misrepresentation or omission. *See Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 687–88 (3d Cir.) *cert. denied,* [—— U.S. ——] 116 L.Ed.2d 52, 112, S.Ct.

79 (1991). [Section 12(2) does not pertain to securities purchased on the "aftermarket." *Id.* at 925 F.2d 693.]

*Westinghouse Sec. Litig.,* 832 F.Supp. at 965–66 (certain citations omitted).

### G. *Controlling Person Liability*

■ Pursuant to section 15 of the Securities Act and section 20(a) of the Exchange Act, a "controlling person" is liable "to the same extent" as the corporation or other controlled person who is liable to an injured party under sections 11 and 12 of the Securities Act and section 10(b) of the Exchange Act, respectively. *See* notes 4 and 3, respectively. Whether a defendant is a "controlling person" within the meaning of federal securities law presents a question of fact which cannot ordinarily be resolved at the pleading stage. *In re World of Wonders Sec. Litig.,* 694 F.Supp. 1427, 1435 (N.D.Cal.1988), *citing Hilgeman v. National Ins. Co. of America,* 547 F.2d 298, 302 (5th Cir.1977).

■ All relevant circumstances are considered in deciding whether a defendant is a controlling person, and courts give "heavy consideration" to the *potential* power of a person to influence and control the activities of another, as opposed to actual exercise of such power. *Rochez Bros., Inc. v. Rhodes,* 527 F.2d 880, 890–91 (3d Cir.1975). Some culpability on the part of the defendant is necessary, *i.e.,* the plaintiff must show the "controlling persons" conduct or inaction in failing to stop a securities violation was deliberate and done intentionally to further the violation. *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 185 (3d Cir.1981), *cert. denied* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). In the case of a director of a corporation which is liable under the securities laws, it is sufficient that he or she participated in meetings at which a fraudulent scheme, policy or practice was discussed. *Monsen,* 579 F.2d at 803–04. The SEC defines "control" (including the term "controlling") as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities,

by contract, or otherwise." 17 C.F.R. § 240.-12b–2.

### [H]. *Aiding and Abetting*

■ [A]ider and abettor liability should properly focus on the connection between the alleged conduct of Westinghouse [the issuer] and the alleged conduct of the secondary defendants, not on the relationship between the plaintiff class and the secondary defendants. Only if Price Waterhouse [the independent public accounting firm], Lazard [an investment banking consultant] and the other underwriters are alleged to have knowingly or recklessly participated in Westinghouse's allegedly fraudulent actions in a substantial way can they be properly held as aiders and abettors. *Monsen v. Consolidated Dressed Beef Co.,* 579 F.2d 793, 799–800 (3d Cir.), *cert. denied,* 439 U.S. 930 [99 S.Ct. 318, 58 L.Ed.2d 323] (1978). The direct liability claims against the accountant and underwriters, by contrast, require examination of the communication or nondisclosure of information by the accountant and underwriters to the plaintiffs. Here, whatever is alleged to have been done or not done by Westinghouse must not be conflated with the allegations against the secondary defendants.

*Westinghouse Sec. Litig.,* 832 F.Supp. at 966 (certain citations omitted).

### *Prefatory Remarks.*

Preliminarily, the Court observes that many, perhaps a majority, of defendants' numerous arguments for dismissal of the Amended Complaint are premature as they involve factual questions and raise disputes as to facts or inferences to be drawn from facts which, under the well-known standards for determining the adequacy of the complaint, cannot be resolved at this stage of the proceedings. It bears repeating that in reviewing motions to dismiss, this Court must take all of the averments of the complaint as true, draw all reasonable inferences in plaintiffs' favor, *Budinsky v. Pennsylvania Dep't of Env. Resources,* 819 F.2d 418, 421 (3d Cir.1987), and must sustain the complaint unless defendants can demonstrate *"beyond a doubt"* that plaintiffs are unable to prove

*any set of facts* that would entitle them to the relief they seek. *Conley,* 355 U.S. at 45–46, 78 S.Ct. at 101–02. Tested by those liberal pleading standards and considering the "general simplicity and flexibility" of the Federal Rules of Civil Procedure, *Shapiro,* 964 F.2d at 284, many of the defendants' arguments in support of dismissal are on the border of frivolous and some cross the border of burdensome.[8]

*Count I—Section 10(b) of the Exchange Act*
**A. The "Chambers Defendants"** [9]

The Chambers Defendants frame their arguments to dismiss around the "spin" they place on the Amended Complaint, characterizing plaintiffs' claims as little more than a disagreement over the choice made between reasonable accounting practices. These defendants state plaintiffs' "fraud claims are based on nothing more than the allegation that Chambers restated its 1989 and 1990 financial statements and that its ... results for year-end December 1991 are materially different than indicated in prior announcements," which does not support an allegation of scienter sufficient to state a claim of fraud. Chambers Defendants' Memorandum of Law, at 1–2. This is an extraordinarily constricted reading of a complaint which asserts much more than a decision to make "accounting adjustments" of some $362 million and includes the requisite allegations that these defendants knowingly or recklessly engaged in a deceptive accounting practice that was designed, maintained and concealed in order to artificially enhance Chambers' profits, its financial picture and financial projections, especially in comparison to those of its competitors, none of whom followed this unique and undisclosed accounting method.

While a section 10(b) claim is not made out where a representor merely changes its mind or its accounting practice, *In re Phillips*

*Petroleum Sec. Litig.,* 881 F.2d 1236, 1245 (3d Cir.1989), or where a plaintiff merely alleges corporate mismanagement in the accuracy of accounting practices, *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977), plaintiffs have alleged that these defendants had actual knowledge or recklessly disregarded the truth that Chambers' accounting practices were improper, inflated earnings and net worth over several years, violated GAAP and were unique to the industry, from the inception of each defendants' participation in the deceptive scheme, and made material misrepresentations or omissions regarding Chambers' accounting practices, its yearly earnings and its net worth and its future financial projections in financial statements, SEC filings and public announcements upon which plaintiffs relied. The thrust of plaintiffs' section 10(b) claim is that these defendants deliberately or recklessly hid expenses in order to artificially enhance the market value of Chambers' securities.

The Amended Complaint quite plainly alleges the requisite scienter as to material misrepresentations in Chambers' financial projections made without a genuine belief or reasonable basis, *see Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929, 948 (1991); *Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985), and as to material misrepresentations and omissions made in financial statements and SEC filings with regard to auditing and accounting practices. *See Bradford–White Corp. v. Ernst & Whinney,* 872 F.2d 1153 (3d Cir.) *cert. denied,* 493 U.S. 993, 110 S.Ct. 542, 107 L.Ed.2d 539 (1989) (upholding jury finding that auditor who claimed to comply with GAAS but did not was liable under section 10(b)) *cited in West-*

---

8. The Court has reviewed all of the challenges to the Amended Complaint raised by each of the defendants. Several of those issues are completely without merit and warrant no further expenditure of judicial resources, and are not discussed, therefore, in this opinion.

9. Adopting the defendants' nomenclature, "Chambers Defendants" refers herein to the Chambers Development Corporation, J. Rangos,

Sr., A. Rangos, J. Rangos, Jr., M. Paretto, W. Nelson, F. Hutchinson, J. Cushma and J. Stotlemyer, who jointly have filed a Motion to Dismiss. (Document No. 66). The remaining defendants directly associated with Chambers are J. Arthur, W. Moffett and H. Scott, who are referred to by this Court and by these defendants in their joint Motion to Dismiss (Document No. 69) as the "Outside Directors."

*inghouse Sec. Litig.*, 832 F.Supp. at 971 (Westinghouse defendants' argument that plaintiffs were "merely quibbling over one of at least two proper methods of establishing loan loss reserves . . . under GAAP . . . loses some force under the combined weight of standards promulgated by the American Institute of Certified Public Accountants and . . . *Bradford–White Corp.* . . . and would be a matter more properly raised on a motion for summary judgment"); *Lerch v. Citizens First Bancorp.*, 805 F.Supp. 1142 (D.N.J. 1992) (allegations that Citizens and its outside auditor knowingly or recklessly violated enumerated GAAP and GAAS alleges requisite scienter to survive motion to dismiss). The motion to dismiss under Rule 12(b)(6) for failure to plead scienter must fail.

The Chambers Defendants vigorously argue the Amended Complaint necessarily *contradicts* an inference of scienter, given the "technical nature of the various accounting standards Chambers supposedly violated, coupled with the consistent string of unqualified audit opinions from a major accounting firm [Grant Thornton]." Memorandum of Law at 19. It is obvious however, that these defendants' *lack* of scienter is not "the *only* inference that can be drawn from the Complaint," as they suggest, *id.*, although it *may* be *one* of the permissible inferences that are plausible. Equally plausible is the inference that the Chambers Defendants acted in concert with Grant Thornton, indeed directed the accounting/auditing firm to hide expenses and inflate net worth by "creative" accounting practices. In light of the Rule 12(b)(6) standards· for determining whether a complaint has stated a claim, the "inherent contradiction" argument is without merit, although the Chambers Defendants are entitled to put this argument to a jury.

Chambers Defendants also claim that the . allegations of scienter in the Amended Complaint are conclusory and do not satisfy the particularity requirements of Rule 9(b). Scienter ("malice, intent, knowledge and other condition of mind") is explicitly permitted to be averred *generally* by Rule 9(b), and is satisfied where, as here, plaintiffs allege defendants had actual knowledge of the materially false and misleading statements or omis-

sions and acted with reckless disregard for the truth. *Christidis*, 717 F.2d at 99–100; *Lerch*, 805 F.Supp. at 1152. The Chambers Defendants' reliance on *Christidis* is misplaced, as the sparse averments to support scienter in the *Christidis* complaint are greatly eclipsed by those in plaintiffs' Amended Complaint.

The Third Circuit found allegations of scienter and fraud deficient in *Christidis* because, despite three amendments to their complaint, plaintiffs still had not alleged the manner in which the defendants knowingly departed from reasonable.accounting practices. *Shapiro*, 964 F.2d at 284. Here, in contrast, plaintiffs have set forth in great detail the manner in which Chambers' accounting policies and practices violated specific GAAP regarding capitalization of landfill development expenses, double counting of expenses, failure to document expenses, and in other ways. It is difficult to imagine a *more* particularized pleading of scienter at this stage of the proceedings.

*Shapiro* also reiterated that "in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs," 964 F.2d at 285, *quoting Craftmatic*, 890 F.2d at 645, and held that plaintiffs could survive a motion to dismiss under Rule 9(b) by alleging the necessary information lies within the corporate defendants' exclusive control and delineating the nature and scope of plaintiffs' efforts to obtain, before filing the complaint, the information needed to plead with particularity. *Shapiro*, 964 F.2d at 285. The Amended Complaint avers that "plaintiffs thoroughly investigate[d] all possible sources of information, including but not limited to all publicly available relevant information, before filing a complaint," as required by *Shapiro*, 964 F.2d at 285, and therefore, even if the Court found the complaint lacking in specifics regarding the Chambers Defendants' scienter (which it does not), the Amended Complaint would survive the motion to dismiss for want of particularity.

Chambers Defendants also assert that the Amended Complaint fails to aver "the degree of control needed to impose ["controlling person"] liability" under section

20(a) (with regard to section 10(b) of the Exchange Act) and also under section 15 (with regard to sections 11 and 12(2) of the Securities Act). This assertion is without merit because each of these defendants is a director and/or officer and each is alleged to have possessed the potential power to influence or control, directly or indirectly, the accounting and auditing activities of Chambers. Such allegations are *plainly* sufficient at this stage. *Westinghouse Sec. Litig.*, 832 F.Supp. at 983; *World of Wonders Sec. Litig.*, 694 F.Supp. at 1435.

**B. Grant Thornton**

██ Plaintiffs have adequately stated a claim for liability under section 10(b) against Grant Thornton as the cases in *this* Circuit applying section 10(b) in the context of liability of professional accounting and auditing firms make clear. *See, e.g., Bradford–White Corp.*, 872 F.2d at 1158–59 (auditing firm liable under section 10(b) for misrepresenting its adherence to GAAS); *Eisenberg*, 766 F.2d at 775–76 (tax attorney liable under section 10(b) where he knowingly or recklessly rendered an opinion in offering memorandum as to tax consequences of investment designed to influence investment decisions, without a genuine belief or reasonable basis to believe opinion was accurate or complete: When a representation is made by professionals or those with greater access to information or having a special relationship to investors, such persons have an obligation to disclose data indicating that the opinion or forecast may be doubtful); *Sharp v. Coopers & Lybrand*, 649 F.2d 175, 183–84 (3d Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982) (accounting firm liable under section 10(b) for misrepresentations made as to tax consequences of investment in tax opinion letter designed to influence the investing public); *Westinghouse Sec. Litig.*, 832 F.Supp. at 982 (allegation that accounting firm's unqualified opinions on Westinghouse's financial statements during class period were material misstatements of material fact knowingly or recklessly made with intent to induce reliance states claim under section 10(b)); *Lerch*, 805 F.Supp. at 1154–55 (accounting firm's certification that issuer's financial statements were accurate and in con-

formity with GAAP and that accounting firm's audits were conducted in accordance with GAAS when, in fact, they were not, and that firm knowingly or recklessly made misrepresentations, states claim under section 10(b)).

Grant Thornton argues plaintiffs' complaint is "schizophrenic" because it alleges Grant Thornton "expressed to Chambers serious concerns and questions about Chambers' capitalization of indirect costs" in 1992, which "flatly contradicts" allegations of securities fraud because Grant Thornton "obviously" would not have expressed such concerns if it had been a knowing participant in the fraud. Grant Thornton's Memorandum of Law (Document No. 57) at 6–9. The patients' "schizophrenia" has been seriously misdiagnosed. Grant Thornton "obviously" disregards the reasonable inference in plaintiffs' favor that this Court *must* draw at this stage, namely that the new team at Grant Thornton assigned to the Chambers account when Knight and others went over to Chambers could not, in good faith, sign-off on the 1991 audit and financial statements, expressed their concerns to Chambers management and were fired for failing to continue to certify Chambers' financial statements and the 1991 audit as Grant Thornton had in the past, knowing or recklessly disregarding the truth of such certification. As with the Chambers' Defendants' arguments about the "inherent contradiction" of the Amended Complaint, Grant Thornton's "schizophrenia" argument asks this Court not only to accept the inference it draws from the allegations but to declare it the *only inference* that may be drawn. Again, this argument is for the jury at the appropriate time, not for the district court deciding a motion to dismiss.

The Court also regards as meritless Grant Thornton's argument that the Amended Complaint lacks the particularity required by the first sentence of Rule 9(b) and alleges "only mere inferences based upon conjectures." Memorandum of Law at 15. To the contrary, as discussed above, the plaintiffs have alleged specific accounting and auditing policies and practices said to have been knowingly and recklessly followed by Grant Thornton in violation of specific GAAP and

GAAS throughout the class period, and have alleged facts upon which Grant Thornton's independence is called into question. Under the circumstances, this Court echoes the sentiments expressed by Judge McGlynn in the Eastern District of Pennsylvania in *In re U.S. Healthcare, Inc. Sec. Litig.*, 122 F.R.D. 467, 470 (E.D.Pa.1988) wherein he stated:

> In my view, the plaintiffs here have clearly met the requirements of Rule 9(b) as articulated by the court of appeals in *Christidis*. Plaintiffs have identified numerous accounting and auditing standards which, they allege, were not followed by Arthur Anderson in preparing the U.S. Healthcare financial statements for the years 1985 and 1986. Plaintiffs have clearly identified the financial statements which they allege were materially false and have particularly identified the allegedly misleading portion of the documents. *It is hard to imagine what more particularity defendants could expect without demanding omniscience on the part of plaintiffs.*

(Emphasis added). *See also In re Fiddler's Woods Bondholders Litig.*, 102 F.R.D. 291 (E.D.Pa.1984) (plaintiffs specifically identified accounting principle defendant accounting firm allegedly had violated, and met essential purposes of Rule 9(b) by providing sufficiently detailed allegations to apprise defendant of the claim against it.)

Moreover, the plaintiffs have not engaged in impermissible "group pleading," as both Grant Thornton and the Chambers Defendants assert. "Particularly in cases of corporate fraud, plaintiffs cannot be expected to have personal knowledge of the details of corporate internal affairs." *Craftmatic*, 890 F.2d at 645. It would be "virtually impossible" for a plaintiff in such cases to plead with specificity which fraudulent acts were committed by which individual defendants, and to require specific wrongful acts be attributed to particular individuals at this stage, before full discovery is completed, would place an unsurmountable obstacle in the way of such suits. *In re MidAtlantic Corp. Shareholder Litig.*, 758 F.Supp. 226, 233 (D.N.J.1990). The Amended Complaint adequately alleges both aiding and abetting and "controlling person" liability, in addition to primary liability of Grant Thornton. *Sharp; Lerch.*

Grant Thornton also requests this Court strike portions of the Amended Complaint pursuant to Rule 12(f) which it claims consists of irrelevant, immaterial and impertinent hearsay, namely published opinions about Chambers by various market analysts which Grant Thornton claims is an improper attempt to plead expert opinion testimony in a complaint. Motions to strike are generally disfavored, and, in the absence of any authority in support or any assertions of prejudice, this Court will not strike the challenged paragraphs. *Great West Life Assurance Co.*, 834 F.Supp. at 862; 5A Wright & Miller, Federal Practice and Procedure, §§ 1380–81. Similarly, this Court will deny the request to strike the request for "experts' fees" in paragraph C of the Amended Complaint's Prayer for Relief at this time.

### C. The "Outside" Directors

Defendants J. Arthur, W. Moffett and H. Scott, the Outside Directors (*see* note 9), seek dismissal of plaintiffs' claims under section 10(b) for securities fraud pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b). For the reasons previously stated, this Court is unable to say that plaintiffs can prove no set of facts that would entitle them to relief against the Outside Directors, both in their individual right, and as "controlling persons" under section 20(a) of the Exchange Act.

According to the Outside Directors, plaintiffs claim the Rangos family ran the company and exercised almost exclusive control over it. In contrast, the Outside Directors state they owned "little or no stock in Chambers," they were not officers or employees of Chambers, and that plaintiffs' allegations as to them are conclusory. Outside Directors' Brief in Support of Motion to Dismiss, at 27. However, the Outside Directors were, indeed, *directors*, and at this stage of the proceedings, that is sufficient to allege claims against them under section 10(b). *See MidAtlantic Shareholder Litig.*, 758 F.Supp. at 233; *Westinghouse Sec. Litig.*, 832 F.Supp. at 983; *Worlds of Wonder Sec. Litig.*, 694 F.Supp. at 1435.

Moreover, if this Court was unable to imagine "any set of facts" upon which plaintiffs' entitlement to relief against the Outside Directors might be established, they have supplied one. Attached to their brief in support of the motion to dismiss as Exhibit 1 is a Proxy Statement for the shareholders' meeting of May 7, 1991, containing biographical and other information regarding the various directors. This Proxy Statement states that Messrs. Arthur, Moffett and Scott comprised the Audit Committee which held three meetings in 1990. The Audit Committee "reviews and monitors the Company's financial reporting and accounting practices, oversees the Company's independent accountants and reviews the effectiveness of the Company's systems of internal control in order to ascertain that those systems are within acceptable limits of sound practice in such matters." Proxy Statement, Brief for Outside Directors, Exhibit 1 at 5.

Plaintiffs' securities fraud claims therefore survive the motion to dismiss by the Outside Directors.

## D. The Underwriters

■ The plaintiffs allege the Underwriters acted knowingly or recklessly by acquiescing in and failing to publicly disclose Chambers' unusual and deceptive accounting practices, that the Underwriters had a duty to require Chambers to disclose its unusual accounting practices with respect to capitalization of certain expenses or modify its Registration Statements and Prospectae and accompanying financial statements so as not to be misleading, and therefore claim that the Underwriters "joined Chambers' scheme to mislead the public, and aided and abetted Chambers' violations of Section 10(b) of the Exchange Act." AC, ¶ 158. In addition to the Underwriters' claims that the amended complaint fails to satisfy the particularity requirement of Rule 9(b) and that it uses impermissible group pleading, which the Court rejects, they also claim that plaintiffs have failed to state a claim for aiding and abetting a Section 10(b) violation. Under an aiding and abetting theory, plaintiffs are required to allege that the Underwriters knowingly or recklessly participated in Chambers'

allegedly fraudulent actions in a substantial way. *Westinghouse Sec. Litig.*, 832 F.Supp. at 966. The Underwriters contend the amended complaint fails to plead sufficient facts to support an allegation that they knew of Chambers' alleged primary violation or that they provided substantial assistance in effecting the violations.

The substantial assistance provided by these Underwriters and the groups of underwriters that participated in the Public Offerings is evident in the complaint and need not be further addressed. As to the scienter requirement, the Underwriters focus on the "knowingly" portion and overlook that recklessness suffices in the Third Circuit to sustain a charge of aiding and abetting a section 10(b) violation. *See Sharp*, 649 F.2d at 193–94; *Westinghouse Sec. Litig.*, 832 F.Supp. at 966. The thrust of plaintiffs' amended complaint is that the financial misrepresentations were of such magnitude regarding the company's earnings and financial net worth at the time the public offerings were made that the Underwriters, who had a duty to examine the Registration Statements, Prospectae and financial statements accompanying said offerings, acted knowingly and recklessly in failing to require disclosure of the unique accounting practices having such an enormous impact ($362 million) on Chambers' financial condition. The Court agrees with plaintiffs that it does not appear beyond doubt they can prove no set of facts in support of their claim which would entitle them to relief. *See Monsen*, 579 F.2d at 802–03. Even though the magnitude of the impact of the accounting practices and misrepresentations made with regard thereto does not constitute proof beyond a reasonable doubt, it does supply an inference more than adequate to sustain the Amended Complaint against the Underwriters at this point.

For the foregoing reasons, the motions of all defendants to dismiss Count I under Section 10(b) of the Exchange Act will be denied.

*Count II—Violations of Sections 11 and 15 of the Securities Act—All Defendants*

■ All defendants except the underwriters assert that plaintiffs' claims under Section 11 of the Securities Act fail to plead

fraud with particularity. Unlike *Shapiro*, upon which these defendants rely, plaintiffs here have selectively parsed their complaint to indicate that their claims under Section 11 are based upon negligence in connection with the Registration Statements and Prospectae accompanying the public offerings. *See* AC, ¶¶ 164, 172. Rule 9(b) does apply to allegations under Section 11 and Section 12(2) of the Securities Act that "are grounded in fraud rather than negligence." 964 F.2d at 288. However, the plaintiffs in *Shapiro* eschewed averments of negligence in their claims under Sections 11 and 12(2), and therefore, the Third Circuit held that Rule 9(b), which "would not appear to apply to claims that the defendant negligently violated Section 11 and 12(2)," does encompass Section 11 and Section 12(2) claims "based on fraud like those before us." 964 F.2d at 288.

In contrast, plaintiffs here have not incorporated the entire complaint in Counts II and III, and the specific paragraphs which they do incorporate for the most part support the inference that the claims under Sections 11 and 12(2) are predicated in negligence. This is all academic anyway because the Court has already found that the allegations of fraud in the Amended Complaint satisfy the particularity requirements of Rule 9(b).

Section 11 explicitly applies to each of the following:

(1) every person who signed the registration statement;

(2) every person who was a director ...;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director ...;

(4) every accountant ... or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement ... any report or evaluation which is used in connection with the registration statement ...; [and]

(5) every underwriter with respect to such security.

Section 11(a)(1)–(5), 15 U.S.C. § 77k(a)(1)–(5). Thus, all of the defendants are presumptively liable under section 11.

 Underwriters also claim that "plaintiffs fail to trace their securities purchases to the registration statements used in the offerings." Brief for Underwriters at 36. Plaintiffs are not required, at this stage, to trace each of their Chambers securities purchases to the Registration Statements, but they are required to allege that they purchased pursuant to the public offerings or that their securities are traceable to those offerings, which they have done. Underwriters also claim that plaintiffs have not alleged a cause of action against them because their claims rest solely on the "expertised portions" of the Registration Statements which would present "due diligence defenses provided under Section 11(b)." Brief for Underwriters at 38. Exactly as the Underwriters state, Section 11(b)'s exemption from liability for those portions of a Registration Statement which purport to be made on the authority of an expert *is a defense* and *not* a part of plaintiffs' claim which must be negated in the complaint. 15 U.S.C. § 77k(b); *Shapiro*, 964 F.2d at 286. The Underwriters' assertions regarding their potential liability under Section 11 are specious in the context of their motion to dismiss.

As these and the remainder of the defendants' challenges to Count II are without merit, the Court will deny the motions to dismiss Count II claiming violations of Section 11 of the Securities Act.

*Count III—Sections 12(2) and 15 of the Securities Act Against Individual Defendants and Underwriters*

 Plaintiffs claim that the individual defendants and the Underwriters "offered, sold and/or solicited the sale of the Chambers securities in the 1989 and 1991 Stock Offerings and the Convertible Debenture Offering for their own financial interest and/or for the financial interest of Chambers." AC, ¶ 173. Section 12(2) of the Securities Act provides that "any person who offers or sells a security by means of a prospectus or oral communication that makes misstatements or omissions of material fact 'shall be liable to the

person purchasing such a security from him.'" *Craftmatic,* 890 F.2d at 634; 15 U.S.C. § 77*l* (2). Interpreting the Supreme Court's decision in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), the Third Circuit in *Craftmatic* held that a "seller" for purposes of Section 12(2), as for Section 12(1), contemplates a buyer-seller relationship not unlike traditional contract privity, and includes one "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the security's owner." *Craftmatic,* 890 F.2d at 635, *quoting Pinter,* 486 U.S. at 634, 108 S.Ct. at 2072.

The Third Circuit held in *Craftmatic:*

> We adopt the *Pinter* analysis and hold that liability under § 12(2) extends not only to those who pass title to the purchaser, but also to those who successfully solicit the purchase, motivated by their own or the security owner's financial interests....
>
> . . . . .
>
> Thus, although an issuer is no longer immunized from § 12 liability, neither is an issuer liable solely on the basis of its involvement in preparing the prospectus. The purchaser must demonstrate direct and active participation in the solicitation of the immediate sale to hold the issuer liable as a § 12(2) seller.

890 F.2d at 636 (citations omitted). The Court added that liability does not extend to collateral participants and held that persons failing to qualify as sellers under *Pinter* may not be held liable under Section 12(2) on an aiding and abetting theory. Applying those principles, the *Craftmatic* court found the plaintiffs' claim that the *Craftmatic* defendants were "sellers" for purposes of Section 12(2) sufficient to survive the Rule 12(b)(6) motion to dismiss because it could not be said, at that juncture, that plaintiffs could prove no set of facts that would entitle them to relief. 890 F.2d at 637. So too in this case, it cannot be said that plaintiffs can prove no set of facts that can demonstrate that the individual defendants and the Underwriters offered, sold and/or solicited the sale of the Chambers securities in the three Public Offerings for their own financial interests and/or the financial interests of Chambers.

■■■ However, Section 12(2) provides a remedy only to buyers of securities in the *initial* distributions, and not to a buyer of securities in the secondary or after-market. *Ballay,* 925 F.2d at 684. Accordingly, to the extent Count III purports to state a claim under section 12(2) against these defendants for plaintiffs who purchased their securities in the aftermarket, the Amended Complaint will be dismissed.

The Amended Complaint also satisfies the pleading requirements and alleges a claim under Section 12(2) of the Securities Act for the role of these defendants as potential "controlling persons" under Section 15 of that Act.

*Count IV—Negligent Misrepresentation—All Defendants*

■■■ This Court has supplemental jurisdiction over plaintiffs' claim that defendants have committed the tort of negligent misrepresentation in a business transaction. *Eisenberg,* 766 F.2d at 778; *Westinghouse Sec. Litig.,* 832 F.Supp. at 987. The elements of negligent misrepresentation are set forth in the Restatement (Second) of Torts, § 552, *id.,* which provides in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) [T]he liability in subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or know that the recipient so

intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

832 F.Supp. at 987–88.

Plaintiffs allege that they and the other class members "relied directly or indirectly upon the material misrepresentations and/or the integrity of the market in trading the securities of Chambers at the prices paid. Such reliance and the fact that defendants' negligence would result in damages to the class were reasonably foreseeable by defendants." AC, ¶ 185.

All of the defendants claim that Count IV is deficient because the fraud on the market theory of presumed reliance which is firmly entrenched in federal securities litigation,[10] is not applicable to a Pennsylvania common law claim of negligent misrepresentation. The district courts of the Third Circuit have divided on this issue which involves a prediction whether the Pennsylvania Supreme Court today would recognize fraud on the market as presumptive proof of reliance.[11] The Court need not and does not decide this issue, however, because plaintiffs have adequately alleged direct reliance in their Amended Complaint which satisfies the element of reliance under the Pennsylvania common law.

■■■ The Court also rejects Grant Thornton's claims that the Pennsylvania common law of negligent misrepresentation requires privity between the buyer of the security and the defendant. *Eisenberg,* 766 F.2d at 778–80 (rejecting defendant's argument that Pennsylvania's privity requirement applicable in legal malpractice actions is also applicable to the tort of negligent misrepresentation in a business transaction involving securities); *Westinghouse Sec. Litig.,* 832 F.Supp. at 987 ("Contractual privity [in securities context] is not required under Pennsylvania law."). Similarly, the Court rejects defendants' contention that plaintiffs' Amended Complaint negates an element of this cause of action because it was not intended for a "limited group of persons for whose benefit and guidance [defendant] intends to supply the information or knows that the recipient intends to supply it," Restatement (Second) of Torts, § 552(2)(a). *See Eisenberg,* 766 F.2d at 799–80; *but cf. Westinghouse Sec. Litig.,* 832 F.Supp. at 988 (cause of action for negligent misrepresentation does not lie against accountants and underwriters under section 552(3) because these defendants are not under a public duty to the investing public). At this stage of the proceedings, this Court cannot say there is no set of facts upon which the plaintiffs will be able to prove negligent misrepresentation. Accordingly, the motions to dismiss Count IV will be denied.

### *Statutes of Limitations*

■■■ Counts I–III, the federal securities laws claims, are subject to a federal "one-year from discovery of violations/three years from date of violation" statute of limitations/repose. Section 13 of Securities Act, 15 U.S.C. § 77m; *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *In re Data Access Sys. Sec. Litig.,* 843 F.2d

---

**10.** See *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Peil v. Speiser,* 806 F.2d 1154 (3d Cir.1986) (cited with approval in *Levinson*). The Third Circuit explained the rationale behind the fraud on the market theory of presumptive reliance in *Piel:* "In an open and developed market, the dissemination of material misrepresentations or withholding of material information typically affects the price of the stock, and purchases generally rely on the price of the stock as a reflection of its value." 806 F.2d at 1161.

**11.** *Compare Westinghouse Sec. Litig.,* 832 F.Supp. at 989 ("it is not reasonable to predict the Pennsylvania Supreme Court would adopt the fraud on the market theory of reliance") *with In re Atlantic Financial Fed. Sec. Litig.,* 1990 WL 171191, *2–3, 1990 U.S. Dist. LEXIS 14807, *6 (E.D.Pa.1990) (predicting that the Third Circuit today would recognize fraud on the market theory as satisfying the element of reliance in Pennsylvania's common law cause of action for negligent misrepresentation); *In re Healthcare Serv. Group., Inc. Sec. Litig.,* 1993 WL 54437, *5–6, 1993 U.S. Dist. LEXIS 2847, *17–*18 (same, adopting reasoning of *Atlantic Financial Fed. Sec. Litig.*).

1537 (3d Cir.), *cert. denied sub nom, Vitiello v. I. Kohlowsky & Co.*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988). Although the federal limitations period absolutely reposes claims filed more than three years from the date of the actual violation, and therefore does not recognize the principle of equitable tolling during a period in which a plaintiff was unaware of the securities fraud, the Pennsylvania two-year statute of limitations applicable to common law negligent misrepresentation in the business context, 42 Pa.C.S. § 5524(7), does recognize equitable tolling in such circumstances.[12] *Bohus v. Beloff,* 950 F.2d 919 (3d Cir.1991); *Urland v. Merrell–Dow Pharm., Inc.,* 822 F.2d 1268 (3d Cir.1987).

The one-year period from discovery for sections 11 and 12(2) of the Securities Act commences on the date on which plaintiffs were on "inquiry notice" of the violation, *i.e.,* after discovery should have been made by the exercise of reasonable care. 15 U.S.C. § 77m. It is unclear whether the "inquiry notice" provisions of section 13 of the Securities Act, 15 U.S.C. § 77m, also apply to section 10(b) claims under the Exchange Act. *Compare Gruber v. Price Waterhouse,* 911 F.2d 960, 964 n. 4 (3d Cir.1990); *Werner v. Satterlee Stephens Burke & Burke,* 797 F.Supp. 1196, 1203–04 (S.D.N.Y.1992), *with Manning v. Maloney,* 787 F.Supp. 433 (M.D.Pa.), *aff'd* 980 F.2d 722 (3d Cir.1992).

■ Plaintiffs' original Consolidated Class Action Complaint was filed on March 18, 1992, and the class period now claimed in the Amended Complaint is from March 18, 1988, through October 20, 1992. Plaintiffs cannot pursue claims for the federal securities violations where they purchased their Chambers securities on or before March 18, 1989, because of the three-year statute of repose, and indeed they do not make such claims. Plaintiffs' Memorandum in Opposition to Chambers Defendants' Motion to Dismiss, at 54.

Accepting, *arguendo* only, defendants' arguments that the "one year from discovery period" commences from the date on which plaintiffs were on "inquiry notice" of the alleged fraud for purposes of section 10(b) as well as for sections 11 and 12(2), plaintiffs' federal securities claims *clearly* are timely for purposes of the motions to dismiss. The Court rejects as frivolous the Chambers Defendants' laborious construction that the *necessary* inference which must be drawn from plaintiffs' Amended Complaint is that they *had to be* on "inquiry notice" of the fraudulent accounting practices well beyond one year from the date the original consolidated Complaint was filed, March 18, 1992, because those practices should have been suspected by the investing public well before March 17, 1992, when Chambers made its public announcement which resulted in a $362 million "accounting adjustment" to earnings from 1985 through 1991. To accept that premise would not only do violence to the standards for deciding a motion to dismiss a complaint, it would also negate and disregard the assumptions upon which the fraud on the market theory of reliance is based. *See Piel v. Speiser,* 806 F.2d 1154 (3d Cir.1986), *approved in Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Finally, because of the equitable tolling principle applied to plaintiffs' Pennsylvania common law claims for negligent misrepresentation, the limitation period for that cause of action would seem to end two years from March 17, 1992, the ostensible date of discovery of the alleged fraud. *Manning,* 787 F.Supp. at 437. Plaintiffs' claims are not barred by any applicable statute of limitations or repose.

### Rule 4(j)—Individual Grant Thornton Partners

■ The individual partners of Grant Thornton have filed a Motion to Dismiss the Amended Complaint because of plaintiffs' failure to serve them within 120 days, as

---

**12.** Equitable tolling applies in the "usual case" where the injured party remains ignorant of the fraudulent conduct without any want of diligence or due care on his or her part. *Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d at 336. In such case, the bar of the statute of limitations does not begin to run until the fraud is discovered, even where the defendant has not taken special efforts to conceal the fraud. *Id., quoting Bailey v. Glover,* 21 Wall 342, 348, 22 L.Ed. 636 (1874).

required by Fed.R.Civ.P. 4(j). (Document No. 93). Until November 30, 1993, Rule 4(j) provided, in relevant part:

> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed ... without prejudice....

However, former Rule 4(j) has been amended and relettered, and now provides:

> **(m) Time Limit for Service.** If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant *or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service* for an appropriate period. The subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1).

Fed.R.Civ.P. 4(m) (West 1993 Supplement) (emphasis added). By Order of the Supreme Court of the United States of April 22, 1993, this amendment took effect on December 1, 1993, and "shall govern all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings in civil cases then pending."

The Notes of Advisory Committee on the 1993 Amendments to the Federal Rules of Civil Procedure explicitly state that the new subdivision (m) "authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown. Such relief formerly was afforded in some cases, partly in reliance on Rule 6(b)." Fed.R.Civ.P. 4(m), Notes of Advisory Committee (West 1993 Supplement).

Plaintiffs concede they inadvertently failed to serve the individual Grant Thornton part-ners, who are represented by the same counsel as the partnership, within the 120–day period required by Rule 4, and they have filed a Motion for Additional Time to Serve the Amended Consolidated Class Action Complaint (Document No. 101) pursuant to Fed.R.Civ.P. 6(b)(2).[13] By this motion, plaintiffs request an additional 30 days from the date upon which an order is entered to serve the Amended Complaint upon the four named partners. Rule 6(b) was not amended in 1993, and it provides, in part, that when "by these rules ... an act is required ... within a specified time, the court for cause shown may at any time in its discretion ... (2) upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect ...," except to the extent provided in certain specific rules of procedure not here relevant. Fed.R.Civ.P. 6(b)(2), Enlargement.

After consideration of memoranda in support of and opposition to defendants' motion to dismiss the Amended Complaint for failure to serve within 120 days after filing plaintiffs' affidavits and the oral arguments of counsel, this Court is convinced plaintiffs have met their burden of demonstrating "excusable neglect" under Rule 6(b)(2) for the late service of the Amended Complaint upon the individual partners of Grant Thornton under the standards enunciated by the Supreme Court in *Pioneer Investment Serv. Co. v. Brunswick Assoc. Ltd.,* —— U.S. ——, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), *citing with approval Dominic v. Hess Oil V.I. Corp.,* 841 F.2d 513, 517 (3d Cir.1988). If the Court had any reservations about applying *Pioneer Investment's* flexible "excusable neglect" standard in the context of Rule 4(j)'s "good cause" requirement, as some courts have had, *see In Re DeFour,* 153 B.R. 853, 857 (Bankr.D.Minn.1993), any reservations were dispelled by the 1993 amendments to Rule 4 explicitly authorizing the district court to "direct that service be effected within a specified time" before the 120–day period, Rule

---

**13.** A separate class action complaint was filed against the individual Grant Thornton partners by David Kaplan, one of the named plaintiffs in this action, at CA93–0354 (W.D.Pa.) as a hedge against an adverse ruling on the partners' motion herein to dismiss the Amended Complaint against them. By separate order, that action will be dismissed.

4(m), even, as the Advisory Committee's Notes indicate, in the absence of "good cause."

Accordingly, the Court will deny defendants' motion to dismiss the Amended Complaint for failure to serve within 120 days of filing, and will grant plaintiffs' motion for an enlargement of time within which to serve same on the individual Grant Thornton partners.

### ORDER OF COURT

AND NOW, this 23rd day of February, 1994, for the reasons set forth in the Opinion accompanying this Order, IT IS HEREBY ORDERED:

(1) Except as set forth in paragraph 5, the Motion of Defendant Grant Thornton to Dismiss Plaintiffs' Claims Against Grant Thornton and/or to Strike Immaterial Allegations in the Amended Consolidated Class Action (Document No. 56) is DENIED.

(2) Except as set forth in paragraph 5, the Defendant Underwriters' Motion to Dismiss (Document No. 58) is DENIED.

(3) Except as set forth in paragraph 5, the Motion of Defendants Chambers Development Co., Inc., and certain individual Chambers Defendants to Dismiss the Complaint (Document No. 66) is DENIED.

(4) Except to the extent set forth in paragraph 5, the defendants, J. Arthur, W. Moffett and H. Scott's Motion to Dismiss (Document No. 69) is DENIED.

(5) Count III of the Amended Consolidated Class Action Complaint is DISMISSED ONLY as to those claims made pursuant to section 12(2) of the Securities Act, 15 U.S.C. § 77l (2), in regard to purchases of Chambers' securities on the "aftermarket."

(6) The Individual Grant Thornton Partner Defendants' Motion to Dismiss for failure to serve Amended Consolidated Class Action Complaint within 120 days (Document No. 93) is DENIED.

(7) Plaintiffs' Motion for Additional Time to Serve Amended Consolidated Class Action Complaint (Document No. 101) is GRANTED; plaintiffs are further DIRECTED to serve said complaint on individual Grant Thornton partners on or before March 25, 1994.

(8) Defendant Grant Thornton's Application for Relief from Consolidation Provisions of Pretrial Order No. 1 (Document No. 92) is DENIED, and Civil Action No. 93–0354, *Option Resource Group, et al v. Chambers Development Company, Inc., et al,* (W.D.Pa.) is consolidated for all pretrial purposes at MDL 982.

(9) Defendant Grant Thornton's Application for Relief from Consolidation Provisions of Pretrial Order No. 1 and Objections to Consolidation of *Kaplan v. Fallon,* Civil Action No. 93–0528, Pursuant to Pretrial Order No. 1 (Document No. 100) are DENIED as moot, Civil Action No. 93–0528 (W.D.Pa.) having been dismissed by separate Order of Court.

(10) In accordance with the Stipulation Regarding Class Certification Procedures (Document No. 112), plaintiffs in *In re: Chambers Development Securities Litigation,* shall file any consolidated motion in support of certification of both plaintiff and defendant classes and a memorandum in support thereof *not to exceed 25 pages* on or before March 7, 1994.

(11) Schedules for defendants' responses to any class certification motion in *In re Chambers Development Company Securities Litigation* and any memoranda in opposition *not to exceed 25 pages,* and for class certification discovery, will be agreed upon by the parties and a proposed Pretrial Order No. 2, by Consent, concerning these matters shall be submitted to the Court for its approval on or before April 27, 1994.

(12) A status/settlement conference is scheduled for 10:30 a.m., on April 29, 1994. No continuance thereof will be considered. Counsel for the parties shall meet and confer to discuss the possibility of settlement of this action on or before April 27, 1994.